Justice Guzman delivered the opinion of the Court.
*542 We live in a highly visual age. Image-capture technology is not only easily accessible, it is virtually omnipresent. Video recordings from security and traffic cameras, dash-cams, television footage, surveillance, and self-recordings have long been a quotidian part of modern life, and with the advent of smartphone camera technology, seemingly everyone has a video recorder at the ready. Unsurprisingly, images captured for myriad purposes, and in various forms, regularly work their way into the courtroom. For decades, trial courts have encountered evidentiary issues related to video evidence and, as video technology continues to become more portable and affordable, will increasingly do so.
If, as it is often said, a picture is worth a thousand words,[1] then a video is worth exponentially more. Images have tremendous power to persuade, both in showing the truth and distorting it. A video can be the single most compelling piece of evidence in a case, captivating the jury's attention like no other evidence could.[2] Video can often convey what an oral description cannot-demeanor, personality, expressions, and motion, to name a few.[3] Because video evidence can be highly persuasive, when objected to, the trial court must carefully evaluate the factors in Texas Rule of Evidence 403, which requires balancing the probative value of the evidence against concerns such as unfair prejudice, the potential to mislead the jury, and needless presentation of cumulative evidence. Rule 403 favors admission by requiring these countervailing concerns to substantially outweigh the evidence's probative value before it may be excluded.[4]
In this personal-injury suit arising from a workplace accident, the employer, believing the employee to be exaggerating the extent of his pain and physical limitations, hired an investigator who conducted surveillance and recorded the employee engaging in physical activities over the course of two days. After much discussion about the video-but without watching it-the trial court excluded the evidence. The employee ultimately prevailed, with the jury assessing nearly $10 million in damages, including almost $4 million for pain and suffering.
The primary issue we address today is whether the trial court erred in excluding the surveillance video without first viewing it. We hold that, except in rare circumstances not present here, when the admissibility of a video is at issue, the proper exercise of discretion requires the trial court to actually view video evidence before ruling on its admissibility. While trial courts have discretion in making evidentiary rulings, we cannot defer to discretion that was not actually exercised. The video here should not have been excluded, and its exclusion was harmful because it went to the heart of the defendant's case. We therefore reverse and remand for a new trial.
I. Background
Diamond Offshore Services Limited and Diamond Offshore Services Company (collectively *543 Diamond) employed Willie David Williams as a senior mechanic on its offshore drilling rig. In January 2008, while working alone on a large, heavy piece of equipment, Williams hurt his back. He never returned to work. Despite two back surgeries in the thirteen months following his injury, Williams continues to suffer back pain and related neurological issues with his foot and toes. Due to these issues and associated physical restrictions, Williams's treating physician declared him "totally disabled at this point."
In May 2011, Williams sued Diamond under the Jones Act, alleging Diamond was negligent and the drilling rig was an unseaworthy vessel. Shortly after filing suit, Williams underwent a functional capacity evaluation (FCE) to assess his physical abilities. The FCE detailed various physical restrictions and determined Williams could perform medium-level physical labor within those restrictions. As part of the FCE, Williams completed a pain questionnaire, and his responses were "consistent" with patients who are "exaggerating their symptoms." The FCE thus concluded: "This score is not consistent with what the client was able to do during the FCE. The client's perception of [his] abilities is less than what he is capable of doing."
Based on this information, Diamond pursued a defensive theory that Williams was overstating his pain and downplaying his ability to return to some form of work. To support that theory, Diamond had Williams surveilled and recorded. In December 2012-seventeen months after the FCE and nearly four years after Williams's second surgery-an investigator recorded him for about an hour over two consecutive days while he was engaged in limited physical activities. Prominent date-and-time stamps appear on all recorded segments.
On one day, the investigator videotaped Williams during a twenty-seven minute time period, which included a break in recording of less than one minute. During that time, Williams operated a mini-excavator to clear away a run-down mobile home. He also bent over thirty-four times in a consecutive four-minute span to pick up smaller debris from the ground and throw it into a trailer bed. The next day, the investigator filmed Williams working on his lifted truck over a thirty-two-minute period, during which the investigator stopped and started recording several times, generating about twenty-eight minutes of total video footage. Williams was perched on a stool for much of the time, but periodically stood up to gather tools and materials. At one point, Williams used his body to maneuver a large "monster wheel" onto his truck.
At trial nine months later, Williams testified he still had "constant pain" in his back and was unable to hold any sort of job because of his pain, physical restrictions, and daily pain medication. His treating physician and other experts supported this assessment, disagreeing with the FCE's work-capacity conclusions and discounting it as outdated because Williams's condition had worsened in the intervening two years. Williams explained he would attempt to do activities he enjoyed, such as working on his vehicle and using the mini-excavator, but he could not engage in those activities for as long as he could before his injuries, and he hurts when he tries, both during and after. Several of Williams's friends and family members described their observations of the mental and physical toll of his injury and pain and expressed concern that, based on their perception of his deterioration rate, Williams would be immobile or wheelchair-bound within a few years.
*544 Diamond offered the surveillance video at trial to counter this evidence and corroborate the FCE. Williams objected, contending impeachment would be improper because Williams admitted he could engage in the activities portrayed, just not for an extended time period and not without pain. He also argued the video was not "a fair representation of his disabilities or abilities" because "[i]t shows nothing of his life inside his home, the copious amounts of pain medication he must take to be able to perform these activities, or the price he has paid through the pain suffered in the subsequent hours and days" and thus should be excluded under Rule 403 as unfairly prejudicial and misleading.
The trial judge first considered admissibility at a motion in limine hearing and, after stating she had not watched the video, ruled Diamond could hold the video in its "reserve bank for impeachment, and that's it" and if Williams "opens the door, then we'll take a look at it." She did not otherwise state a basis for her ruling. At trial, Diamond offered the video on three separate occasions, both for impeachment and as substantive evidence regarding Williams's pain and physical abilities.[5] Each time, the trial judge stood by her prior ruling after only a brief exchange with counsel.
The jury returned a verdict for Williams, finding nearly $10 million in lost earning capacity, medical expenses, pain and suffering, disfigurement, and physical impairment. In a split decision, the court of appeals affirmed, determining the trial court had not abused its discretion in excluding the video.[6] The dissent would have reversed and remanded for a new trial, concluding that excluding the surveillance footage, which "goes to the heart of each of Williams'[s] damages questions," was harmful error.[7]
II. Discussion
A. The Trial Court Abused its Discretion in Ruling Without First Watching the Video
The Texas Rules of Evidence provide for the general admissibility of all evidence having any tendency to make a fact of consequence more or less probable.[8] Even if relevant, however, evidence may be excluded "if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."[9]
Trial courts play a vital role in evaluating evidence. Being present in the courtroom and having the most familiarity with the case, the trial court is best positioned to assess whether evidence is unfair or potentially misleading.[10] When a *545 Rule 403 objection is at issue, the trial court must balance probative value against the relevant countervailing factors to determine admissibility.[11] The trial court has extensive discretion in evidentiary rulings, and we will uphold decisions within the zone of reasonable disagreement.[12]
The trial court's discretion, however, is not without limits. We afford no deference when the record affirmatively establishes the court could not have properly exercised its discretion. Here, the trial court excluded the surveillance video despite never having viewed it. Under these facts, that amounted to an abuse of discretion.
Williams asserts the judge's limine-hearing statement that she had not watched the video does not preclude a determination that she did so later and, consistent with the presumption of regularity of proceedings,[13] we should presume she watched it at some point before ruling at trial. We reject this argument. The presumption of regularity applies only when the record is silent or ambiguous and, even then, only to reasonable presumptions.[14] The record here is neither silent nor ambiguous. During the limine conference, the judge said she did not watch the video and would revisit the matter only if Williams opened the door to impeachment; at trial, she repeatedly ruled that he had not. Under these circumstances, we cannot reasonably presume the trial court viewed the surveillance video on her own, without informing the parties, when the condition she set for viewing it never occurred.
Our sister criminal court has emphasized the importance of viewing videos before ruling on admissibility, noting it is "difficult for a trial judge to weigh the probative value [of a video] against the potentially unfair prejudice ... without first reviewing it."[15] Appellate courts around the country have similarly admonished trial courts that the proper exercise of discretion requires viewing visual evidence, particularly when balancing under Rule 403.[16]
*546 We addressed an analogous situation involving disclosure of trade-secret information in In re M-I L.L.C.[17] To avoid disclosing sensitive information to the defendant's corporate representative, the plaintiff sought to conduct a portion of a temporary-injunction hearing outside his presence.[18] Without learning anything about the information to be protected, the trial court denied the plaintiff's request, apparently believing the defendant had an absolute due-process right to have its representative present.[19] The plaintiff sought a writ of mandamus from the court of appeals and submitted an affidavit in camera discussing the trade-secret information.[20] After the appeals court denied the mandamus petition, the trial court ordered the plaintiff to produce the affidavit to the defendant without ever examining it in camera.[21] We subsequently granted mandamus relief, concluding the trial court abused its discretion in ordering the affidavit produced without first reviewing its contents and in failing to conduct the required due-process balancing before refusing to exclude the defendant's representative.[22] "Without knowing what [the] alleged trade secrets were, the trial court simply could not have conducted the required balancing."[23]
We hold that, as a general rule, a trial court should view video evidence before ruling on admissibility when the contents of the video are at issue. We recognize circumstances might arise where viewing is unnecessary or extremely onerous. For example, "[t]here may be cases where the probative value of the evidence is so minimal that it will be obvious to the court that the potential prejudice ... substantially outweighs any probative value the evidence might have."[24] Additionally, video depositions need not be viewed before ruling on objections unless the objection is specific to a visual aspect of the deposition. Exigencies of trial, moreover, could make it difficult to find time to view *547 a late-offered video, especially if the video is lengthy. The parties could potentially address such timing issues by submitting representative excerpts for the trial court's review. In any event, trial courts should "undertake their best efforts in attempting to view the subject visual recording prior to ruling on its admissibility."[25] Exceptions should be few and far between.
This case does not justify an exception. Proper exercise of discretion here required the trial judge to watch the video. Diamond sought to give the jury a visual representation of Williams performing activities he said caused him pain. The probative value of the evidence derives directly from Williams's appearance as he performed the surveilled tasks. Fully assessing the probative value of this visual was impossible based solely on the parties' descriptions. Though everyone agreed it was Williams who appeared on the video performing certain physical activities,[26] each side offered its own spin. Williams argued he "tried" to perform these activities for limited periods and experienced pain, whereas Diamond described Williams as moving with "evident ease and fluidity of motion" while operating power tools and machinery, bending, reaching, and throwing. The trial judge should have assessed the video for herself rather than relying on counsel's descriptions and arguments.[27] Further, only by viewing the video could the trial court determine whether the jury might misinterpret some of the segments as being continuous despite the prominent time stamp, or whether seeing Williams bend and gather debris more than thirty times in the span of a few minutes had the same impact as testimony that he could pick up small things on occasion. The video was relatively short-about an hour-and could possibly have been edited by agreement. Nothing in the record reveals any exigency that would have made viewing the video difficult. We hold the trial court here could not properly exercise its discretion without watching the video.
B. The Video Should Not Have Been Excluded Under Rule 403
Because the trial court did not properly exercise its discretion in excluding the surveillance video without viewing it, we conduct our own independent Rule 403 analysis.
*548 [28] Considering the relevant factors, we conclude any countervailing concerns do not substantially outweigh the video's probative value and, consequently, the video cannot be excluded under Rule 403.[29]
Before we begin our analysis, it is important to note that in personal-injury cases, video footage of a plaintiff can originate not only, as here, from defense-initiated surveillance but also from plaintiff-prepared day-in-the-life videos and third-party sources like security cameras and eyewitnesses. Many of the issues we discuss today can arise with any personal-injury plaintiff video, though each form also has its own particular concerns. No matter the type of video, each case must be evaluated individually.
Courts have found video depictions of a personal-injury plaintiff engaging in activities like bathing, dressing, walking, participating in leisure activities, and working to be probative as to critical allegations such as malingering, condition before and after an injury, and pain and suffering.[30] "Such evidence is often desired because films illustrate, better than words, the impact the injury [had] on the plaintiff's life."[31] A video can also undermine a plaintiff's credibility if it suggests exaggeration or flat-out dishonesty regarding pain or abilities.[32]
We have viewed the surveillance video of Williams and conclude it is probative of his physical abilities and associated pain. Williams sought damages for total loss of earning capacity, claiming he would never again be able to hold any type of job. He also asked for compensation for pain and suffering and loss of enjoyment of life because he can no longer do activities he likes for long periods and not without pain during and after. The video, which depicted Williams doing physical activities he enjoys and which could have potentially been the basis for employment, on two consecutive days, is obviously probative as to all these issues. Moreover, Diamond explicitly attacked Williams's credibility, both as to the circumstances of his injury and whether he overstated the extent of his limitations and pain. Seeing Williams on the video could have helped the jury evaluate his truthfulness.
Williams argues the video was properly excluded as cumulative because he admitted he could do all the activities depicted. Videos, however, are qualitatively different than other types of evidence. "[A] video recording allows a more panoramic representation" of the evidence than a document, testimony, or even a photograph.[33] The mere fact that Williams *549 conceded he could work on his truck or operate his mini-excavator for short time periods does not automatically render a visual representation of him doing so cumulative.[34] Allowing the jury to see what Williams looked like while engaging in these activities-including how vigorously he worked, whether he limped or showed any difficulty in moving, how many times he bent over in quick succession, and whether he showed any signs of discomfort-would have provided information that Williams's bare testimony could not. Thus, the video was not needlessly cumulative.
Concerns over unfair prejudice often arise with video evidence in personal-injury cases. "[T]estimony is not inadmissible on the sole ground that it is 'prejudicial' because in our adversarial system, much of a proponent's evidence is legitimately intended to wound the opponent."[35] Rather, unfair prejudice is the proper inquiry.[36] " 'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[37]
Williams contends the video unfairly prejudices him by suggesting he can work without rest and without pain. That is exactly why Diamond offered the evidence-to show Williams and his witnesses overstated the extent of his physical limitations and pain. Mere damage to an opponent's case does not constitute unfair prejudice.[38] The video does not encourage the jury to decide on any improper basis, but rather on the basis that Williams's condition is not as severe as he claims. That is not unfair.
Williams's chief complaint is that the video misleads the jury by falsely portraying him as able to be physically active for long periods without pain. Videos of injured plaintiffs will, by their very nature, be incomplete. It is impractical if not impossible to record all of a plaintiff's post-injury life. Parties select what to record, or what part of a recording to show, to best help their case. That is inherent in our adversarial system. A video is not misleading just because it does not support the *550 opponent's view of the case.[39] Alleged omissions or inaccuracies typically go to the weight of the evidence, not its admissibility.[40]
Here, Williams does not allege the actual contents of the video are untrue. Williams did exactly what is shown. Williams's issue is with what is not shown-rest periods, pain, or the use of pain medication. The record, however, contains no indication that Williams actually rested, experienced pain, or took medication associated with the specific recorded activities. A theoretical omission does not establish the jury could have been misled. Williams complains the video gives the misimpression that he can work for long stretches at a time. We disagree. The investigator recorded Williams for approximately thirty minutes on two consecutive days. The change in scenery and clothing, plus the prominent date-and-time stamp, make clear that two different days are shown. Moreover, jurors can be expected to understand that a half-hour segment does not purport to represent an entire day. Had the jury seen the video, Williams would have been free to explain what he did the rest of those days and how he felt during and after the activity shown.[41]
Williams repeatedly emphasizes the investigator's selective recording of his activities. Bias incentives may arise with videos created for litigation. This is of particular concern when, unlike here, the plaintiff is aware of being filmed, which may cause self-serving behavior, whether consciously or not.[42] In this case, no evidence exists of improper filming. Williams has not alleged any specific omission from the recordings that would render them misleading. Diamond's videographer was available for deposition and at trial to provide any desired information regarding the circumstances of recording. The recorded segments contain only a few short pauses. Williams does not contend the recording was altered in any way, and Diamond produced all footage taken.[43] We perceive no significant risk of the video misleading the jury.
*551 The video's probative value is significant, and concerns about cumulativeness, unfair prejudice, and misleading the jury do not substantially outweigh this value. Williams and his witnesses were available to provide any necessary context about information not shown on the video. The video could not have been excluded under Rule 403.
C. The Trial Court's Abuse of Discretion Was Harmful
Trial court error is reversible only when harmful, that is, if the error "probably caused the rendition of an improper judgment."[44] This standard is less a precise measurement and more a matter of judgment.[45] We review the entire record to assess the importance of the excluded evidence, and exclusion is likely harmful if the evidence is crucial to a key issue.[46]
Having reviewed the record as a whole, we conclude excluding the surveillance video was harmful. At trial, Williams testified he cannot work because of his pain, medication, and related physical limitations. He told the jury about his constant pain and daily struggles in trying to do activities he enjoys even for short periods, like working on his truck or operating his mini-excavator, and how he pays for it later when he does. A parade of friends and family members recounted their observations of Williams-his inability to do certain things, his deteriorating condition, and the pain visible on his face. Williams's counsel directly asked each witness if Williams's pain was real, and they all said it was, based on what they had seen. During pretrial proceedings, Williams argued these witnesses were important, stating "it's clearly directly probative for somebody who's an eyewitness to say, 'This is what I physically see in this man before and after.' "
If testimony about what others saw Williams do was important, then giving the jury an opportunity to actually witness Williams performing similar activities is just as important. Subjective pain and suffering is difficult to refute. Seeing how Williams looked performing physical labor on two consecutive days, unaware of being recorded and thus with no incentive to exaggerate, is qualitatively different than hearing his and his witnesses' descriptions and would likely have had a powerful impact.
Furthermore, the video could have supported the FCE's conclusions that Williams was able to perform medium-intensity work and was exaggerating his symptoms while understating his abilities. Williams's experts discounted the FCE as being out of date, but the surveillance video, taken seventeen months after the FCE and nine months before trial, would have provided more recent, and therefore potent, cross-examination material to undermine their opinions. Conversely, the video could have bolstered Diamond's experts, who relied on the FCE, and allowed Diamond's spinal expert to explain to the jury, as he did during his offer of proof, that seeing the video changed his opinion regarding Williams's work abilities and reinforced the FCE's conclusions.[47]
*552 Two-thirds of the jury's nearly $10 million damages finding consisted of soft damages, such as pain and suffering, for which no objective measure is available. Seeing the video and considering its effect on the testifying witness could have altered those subjective numbers and the amounts awarded for lost earning capacity if the jury believed Williams could hold some type of job.[48]
Williams's credibility was a central defensive issue, not just regarding pain and physical limitations but also on liability. Diamond explicitly and repeatedly advocated that Williams had lied about the circumstances giving rise to his injury, which directly related to Diamond's liability. If, with the aid of the video, the jury had believed Williams or his witnesses were exaggerating his pain and physical limitations, it might have undermined his overall credibility.[49]
Because the video was crucial to the defensive theories of exaggeration and dishonesty, the video's exclusion probably caused the rendition of an improper judgment and was, therefore, harmful error.[50]
III. Conclusion
The trial court abused its discretion by excluding Diamond's surveillance video of Williams without viewing it first. Based on our independent review, the video should not have been excluded under Rule 403, and doing so was harmful error. We reverse and remand for a new trial.[51]

Brookshire Bros., Ltd. v. Aldridge , 438 S.W.3d 9, 17, 22 (Tex. 2014).

See Bannister v. Town of Noble , 812 F.2d 1265, 1269 (10th Cir. 1987) ; Bolstridge v. Cent. Me. Power Co. , 621 F.Supp. 1202, 1204 (D. Me. 1985) ; Wal-Mart Stores, Inc. v. Hoke , No. 14-99-00503-CV, 2001 WL 931658, at *17 (Tex. App.-Houston [14th Dist.] Aug. 16, 2001, no pet.) (not designated for publication) (Hudson, J., concurring).

See Masinga v. Whittington , 792 S.W.2d 940, 943 (Tex. 1990) (orig. proceeding) (discussing video depositions).

Casey v. State , 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).

Diamond's arguments in this appeal focus on the substantive as opposed to impeachment value of the video. Williams argues Diamond offered the video at trial only for impeachment purposes and thus has not preserved the issue presented. The context, including reference back to limine arguments, shows Diamond offered the evidence at trial for both purposes. See Babcock v. Nw. Mem'l Hosp. , 767 S.W.2d 705, 708 (Tex. 1989).

510 S.W.3d 57, 73 (Tex. App.-Houston [1st Dist.] 2015).

Id. at 91 (Keyes, J., dissenting).

Tex. R. Evid . 401 -02.

Tex. R. Evid . 403.

See Sprint/United Mgmt. Co. v. Mendelsohn , 552 U.S. 379, 384, 128 S.Ct. 1140, 170 L.Ed.2d 1 (2008) ("In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings."). When, as here, the relevant evidentiary rules are similar, we may look to federal law for guidance. Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd. , 337 S.W.3d 846, 856 n.6 (Tex. 2011).

Montgomery v. State , 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (op. on reh'g).

See Sprint , 552 U.S. at 384, 128 S.Ct. 1140 ; Caffe Ribs, Inc. v. State , 487 S.W.3d 137, 142 (Tex. 2016) ; Montgomery , 810 S.W.2d at 391.

See McElyea v. Parker , 125 Tex. 225, 81 S.W.2d 649, 653 (1935) ("Everything must be presumed in favor of the judgment, which is not concluded by the record."); S. Ins. Co. v. Brewster , 249 S.W.3d 6, 13 (Tex. App.-Houston [1st Dist.] 2007, pet. denied) ("Well-settled law compels that we presume that proceedings in the trial court, as well as its judgment, are regular and correct.").

See Rolison v. Puckett , 145 Tex. 366, 198 S.W.2d 74, 77 (1946) ; Vickery v. Comm'n for Lawyer Discipline , 5 S.W.3d 241, 251 (Tex. App.-Houston [14th Dist.] 1999, pet. denied).

Salazar v. State , 90 S.W.3d 330, 336-37 (Tex. Crim. App. 2002) ; see also Gordon v. State , 784 S.W.2d 410, 412 (Tex. Crim. App. 1990) ("[A] decision [under Rule 403 ] must be made by the trial court after viewing the tape.").

See, e.g. , Tabieros v. Clark Equip. Co. , 85 Hawai'i 336, 944 P.2d 1279, 1318 (1997) (trial court erred in excluding video without watching; "[w]here the admissibility of the contents of a visual recording is at issue in a judicial proceeding, we direct that Hawaii trial courts in the future undertake their best efforts in attempting to view the subject visual recording prior to ruling on its admissibility"); Sweet v. Pace Membership Warehouse, Inc. , 795 A.2d 524, 529 (R.I. 2002) (trial court erred in excluding videos without reviewing first; on remand, "the trial justice should review the tapes and evaluate their admissibility under Rule 403"); see also United States v. Cunningham , 694 F.3d 372, 388 (3d Cir. 2012) ("[B]ecause the District Court abused its discretion when it decided not to watch the videos before admitting them under Rule 403, its underlying Rule 403 determination is not entitled to the full range of deference that we would normally give to it on appeal."); United States v. Loughry , 660 F.3d 965, 972 (7th Cir. 2011) ("Without looking at the videos for itself, the court could not have fully assessed the potential prejudice to Loughry and weighed it against the evidence's probative value."); United States v. Curtin , 489 F.3d 935, 958 (9th Cir. 2007) ("One cannot evaluate in a Rule 403 context what one has not seen or read."); Bannister v. Town of Noble , 812 F.2d 1265, 1270 (10th Cir. 1987) (to make a Rule 403 determination, "the judge should examine a film outside the presence of the jury"); Commonwealth v. Carey , 463 Mass. 378, 974 N.E.2d 624, 627 (2012) ("[T]he judge's failure to view the video prior to ruling that its probative value outweighed its prejudicial effect was an abuse of discretion."); Commonwealth v. Impellizzeri , 443 Pa.Super. 296, 661 A.2d 422, 428 (1995) ("[B]ecause a videotape by its nature has the potential to make a stronger impact than oral testimony, the trial judge should view the tape in camera prior to showing it to the jury. This is particularly true where the opposing party claims that the tape is overly prejudicial." (citation omitted)); 44 Am. Jur. Trials 171Videotape Evidence § 74 ("[I]n-camera review should always take place if an objection has been made to the admissibility of the evidence.").

505 S.W.3d 569 (Tex. 2016) (orig. proceeding).

Id. at 572.

Id.case-ids="12182474" index="39" url="https://cite.case.law/sw3d/505/569/"> at 573, 576.

Id.case-ids="12182474" index="40" url="https://cite.case.law/sw3d/505/569/"> at 573-74.

Id.

Id.case-ids="12182474" index="42" url="https://cite.case.law/sw3d/505/569/"> at 576, 579-80.

Id. at 576.

United States v. Loughry , 660 F.3d 965, 971 (7th Cir. 2011) ; accord United States v. Cunningham , 694 F.3d 372, 392 (3d Cir. 2012) (quoting Loughry ).

Tabieros v. Clark Equip. Co. , 85 Hawai'i 336, 944 P.2d 1279, 1318 (1997).

Williams contends Diamond did not lay a proper foundation to authenticate the video. See Tex. R. Evid. 901. Video can be authenticated by anyone with knowledge of the information recorded, including the party against whom it is offered. See Tex. R. Evid . 1007 ; Huffman v. State , 746 S.W.2d 212, 222 (Tex. Crim. App. 1988) ; Davidson v. Great Nat'l Life Ins. Co. , 737 S.W.2d 312, 314-15 (Tex. 1987). Because Williams admitted in pretrial proceedings, at trial, and at all appellate levels that he is the person on the video and he in fact performed the activities depicted, authenticity has been established. See Dunn v. Bank-Tec S. , 134 S.W.3d 315, 329 (Tex. App.-Amarillo 2003, no pet.) (subject of surveillance authenticated video); Reinoehl v. Trinity Universal Ins. Co. , 130 Ohio App.3d 186, 719 N.E.2d 1000, 1006 (1998) (same). Any argument that the video is inaccurate because it does not depict things like rest periods goes to substance, not authenticity. See Reinoehl , 719 N.E.2d at 1006 ; 2 McCormick on Evidence § 216 ("[T]he requisite authentication foundation may be laid ... by the photographer or any witness who was present when the film was made and who therefore perceived the events filmed. Objections that a video or film is unduly prejudicial or distorted in some significant way, or has been edited and is therefore misleading, are resolved pursuant to Federal Rule 403." (citations omitted)).

See Cunningham , 694 F.3d at 386 ("[A] district court should know what the challenged evidence actually is-as opposed to what one side or the other says it is...."). The briefs here further illustrate the problem, with Diamond saying Williams "moves about freely" while Williams says he was "limping" throughout the video.

See Loughry , 660 F.3d at 967, 972-74 ; Commonwealth v. Carey , 463 Mass. 378, 974 N.E.2d 624, 627 (2012).

We are evaluating the video in the context of the conditions that existed during trial. On remand, the trial court is free to consider whether any changed circumstances, including the age of the video and any differences in Williams's physical condition, alter the analysis.

See Jones v. City of L.A. , 20 Cal.App.4th 436, 24 Cal.Rptr.2d 528, 531 (Ct. App. 1993) ; James v. Carawan , 995 So.2d 69, 75-76 (Miss. 2008) ; see also Sweet v. Pace Membership Warehouse, Inc. , 795 A.2d 524, 527-29 (R.I. 2002).

Bannister v. Town of Noble , 812 F.2d 1265, 1269 (10th Cir. 1987) (internal quotation marks omitted); accord Grimes v. Emp'rs Mut. Liab. Ins. Co. , 73 F.R.D. 607, 610 (D. Alaska 1977).

See James , 995 So.2d at 76 ; Zegarelli v. Hughes , 3 N.Y.3d 64, 781 N.Y.S.2d 488, 814 N.E.2d 795, 798 (2004) ; Sweet , 795 A.2d at 528-29.

See Gordon v. State , 784 S.W.2d 410, 412 (Tex. Crim. App. 1990) ; see also Grimes , 73 F.R.D. at 610 ; Jones , 24 Cal.Rptr.2d at 533-34 ; Martinez v. State , 468 S.W.3d 711, 718 (Tex. App.-Houston [14th Dist.] 2015, no pet.).

See United States v. Patrick , 513 Fed.Appx. 882, 887 (11th Cir. 2013). Litigants can generally present their case in the manner of their choosing, subject to limitations in the evidentiary rules. See, e.g. , Old Chief v. United States , 519 U.S. 172, 186-87, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) ("[T]he familiar, standard rule [is] that the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it.").

Bay Area Healthcare Grp., Ltd. v. McShane , 239 S.W.3d 231, 234 (Tex. 2007).

Tex. R. Evid . 403 ; see also Baker v. Canadian Nat'l/Ill.Cent. R.R. , 536 F.3d 357, 369 (5th Cir. 2008) ; James , 995 So.2d at 78.

Old Chief , 519 U.S. at 180, 117 S.Ct. 644 (quoting Fed. R. Evid . 403 advisory committee's notes) (internal quotation marks omitted); accord Montgomery v. State , 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (op. on reh'g). Videos of an injured plaintiff could be unfairly prejudicial, for example, by focusing too much on pain or graphic wounds, appealing to emotion through moving music or overly sympathetic circumstances, or depicting the plaintiff in offensive clothing or engaging in potentially objectionable activities. See, e.g. , Baker , 536 F.3d at 369 ; Grimes , 73 F.R.D. at 610 ; Jones , 24 Cal.Rptr.2d at 533 ; Donnellan v. First Student, Inc. , 383 Ill.App.3d 1040, 322 Ill.Dec. 448, 891 N.E.2d 463, 475 (2008) ; Salazar v. State , 90 S.W.3d 330, 336-38 (Tex. Crim. App. 2002) ; Nat'l Freight, Inc. v. Snyder , 191 S.W.3d 416, 424 (Tex. App.-Eastland 2006, no pet.).

See James , 995 So.2d at 78.

See Patrick , 513 Fed.Appx. at 889 ; see also Baker , 536 F.3d at 369.

See Ponder v. Cartmell , 301 Ark. 409, 784 S.W.2d 758, 761 (1990) ; Sjostrand v. N.D. Workers Comp. Bureau , 649 N.W.2d 537, 546-47 (N.D. 2002) ; Kessler v. Fanning , 953 S.W.2d 515, 522 (Tex. App.-Fort Worth 1997, no pet.) ; see also United States v. Parks , 100 F.3d 1300, 1305 n.2 (7th Cir. 1996).

See Patrick , 513 Fed.Appx. at 888-89 ("A video recording of only a portion of the events is not inherently less admissible than the testimony of a live witness who saw only part of a crime or a photograph that captures an isolated moment from a single perspective. ... While it is undoubtedly true that the videos cannot be cross-examined, Patrick can point out their limitations to the jury and offer evidence to put what they depict in context."); Jones , 24 Cal.Rptr.2d at 533 (concluding day-in-the-life video was probative and because the plaintiff and her nurse, who was present during filming and narrated the video at trial, were available for cross-examination, "the risk of any prejudice was greatly reduced"); Broadbent v. Allison , 176 N.C.App. 359, 626 S.E.2d 758, 764 (2006) ("Defendants argue that the editing, which condenses a series of airplane fly-overs into six minutes which actually occurred over several months, makes it appear that the intrusion was much more frequent than it actually was. However, the jury was told that the videos were edited from many hours of tape recorded over a period of several months, and the video was time-stamped, so the jury could see exactly when each segment was recorded.").

See Bannister v. Town of Noble , 812 F.2d 1265, 1269 (10th Cir. 1987).

In appropriate cases, the rule of optional completeness might allow the opposing party to introduce additional footage. See Tex. R. Evid . 107 ; Credille v. State , 925 S.W.2d 112, 116-17 (Tex. App.-Houston [14th Dist.] 1996, pet. ref'd). Here, Diamond's proffer contained all video recorded on those two days.

Tex. R. App. P . 44.1(a) ; Caffe Ribs, Inc. v. State , 487 S.W.3d 137, 144-45 (Tex. 2016).

Reliance Steel & Aluminum Co. v. Sevcik , 267 S.W.3d 867, 871 (Tex. 2008).

Caffe Ribs , 487 S.W.3d at 145 ; Reliance , 267 S.W.3d at 873.

See Stergiou v. Gen. Metal Fabricating Corp. , 123 S.W.3d 1, 6 (Tex. App.-Houston [1st Dist.] 2003, pet. denied) (harmful error in excluding testimony that would have substantiated defendant's contentions in "hotly-contested, fact-intensive case").

See Reliance , 267 S.W.3d at 873 ("[M]ost of the damages here were difficult to gauge, stemming as they did from soft-tissue injuries and impairments whose effects were hard to measure objectively. Given that the trial focused primarily on setting damage amounts as to which jurors have few clear guideposts, it is probable that proof of Reliance's huge revenues played a crucial role on the key issue at trial.").

See James v. Carawan , 995 So.2d 69, 76 (Miss. 2008) (harmful error in excluding video of personal-injury plaintiff riding roller coaster because video could have called into question work abilities and extent of pain and "might [have] shed doubt upon the merits of Carawan's case as a whole"); see also Baker v. Canadian Nat'l/Ill. Cent. R.R. , 536 F.3d 357, 369 (5th Cir. 2008) (stating because "Baker's post-accident quality of life was hotly disputed, and Baker's witnesses testified in detail regarding the allegedly severe post-accident limitations Baker faces," a video showing Baker engaging in daily activities "weighs heavily" in contradicting these statements); Brookshire Bros., Ltd. v. Aldridge , 438 S.W.3d 9, 22 (Tex. 2014) (noting bias issues with eyewitnesses).

See Chiasson v. Zapata Gulf Marine Corp. , 988 F.2d 513, 518 (5th Cir. 1993) (error relating to failure to timely disclose surveillance video harmful because the importance of the video is "obvious"); Zegarelli v. Hughes , 3 N.Y.3d 64, 781 N.Y.S.2d 488, 814 N.E.2d 795, 798 (2004) (harmful error in excluding surveillance video because it would have undermined plaintiff's credibility); Castro v. Sebesta , 808 S.W.2d 189, 193 (Tex. App.-Houston [1st Dist.] 1991, no writ) (harmful error in excluding twenty-seven of thirty accident-scene photos because "the excluded photographs vary significantly from the admitted photographs and give a more comprehensive view" of the case and thus their exclusion "limited the jury's view of the havoc defendant's conduct wreaked on plaintiff").

Diamond also argues the trial court erred in excluding evidence that it paid Williams eighty-five percent of his salary for several years after his injury. The court of appeals assumed, without deciding, that the trial court so erred but affirmed on this point, concluding any error was harmless. 510 S.W.3d 57, 73 (Tex. App.-Houston [1st Dist.] 2015). Because we remand for a new trial based on the excluded surveillance video, we need not address whether any error in excluding the salary evidence was also harmful.