In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-23-00136-CV

**JUSTIN LEE OBERNUEFEMANN AND MEAGAN OBERNUEFEMANN,**
**Appellants**

**V.**

**STOUT HOMEBUILDERS, LLC, Appellee**

**On Appeal from the 163rd District Court**
**Orange County, Texas**
**Trial Cause No. B180270-C**

## MEMORANDUM OPINION

In this home construction dispute concerning overages, Appellants Justin Lee Obernuefemann and Meagan Obernuefemann ("Justin," "Meagan," or collectively "the Obernuefemanns") appeal from a jury's verdict awarding damages to Appellee Stout Homebuilders, LLC ("Stout"). In four issues, the Obernuefemanns complain the trial court erred by admitting evidence and submitting a jury question related to damages that was unsupported by the evidence. We affirm the trial court's judgment.

1

# BACKGROUND

The Obernuefemanns hired Stout to construct their new home in Orange County for $433,370. Stout's Proposal, which was noted as a Base Proposal, states that "BUILDER SHALL PROVIDE ALL LABOR, MATERIALS, AND OTHER ITEMS NECESSARY TO PERFORM THE FOLLOWING WORK FOR A FIXED SUM." The Proposal also states:

> BUILDER SHALL PROVIDE THE FOLLOWING ITEMS FOR THE AMOUNT ALLOWED FOR EACH SPECIFIC ITEM. THE ALLOWANCE ITEMS SHALL BE SELECTED HAS [sic] PROVIDED HEREIN. BUILDER WILL GIVE A CREDIT FOR ANY COST SAVINGS ON AN ALLOWANCE ITEM. OWNER WILL PAY TO BUILDER ANY EXCESS OF AN ITEM OVER THE ALLOWANCE AMOUNT.

The Proposal included allowances for materials and labor and stated that certain upgrading would be at the Obernuefemanns' expense. The Proposal specified, among other allowances, that the tile allowance was $16,800, the material allowance for all flooring was $7,740, and that "***THIS IS THE STARTING PRICE***[.]" The Proposal provided that "ANY ALTERATION OR DEVIATION FROM ABOVE SPECIFICATION INVOLVING EXTRA COST WILL BE EXECUTED ONLY UPON WRITTEN ORDERS, AND WILL BECOME AN EXTRA CHARGE OVER AND BEYOND THE ORIGINAL ESTIMATE." The record includes Stout's exhibit showing the Obernuefemanns' "CUSTOMER AUTHORIZED EXTRAS" totaling $48,358.07 along with receipts for the overages.

2

In April 2018, the Obernuefemanns closed on their home before construction was complete, and Adam Stout ("Adam") executed a Bills-Paid Affidavit ("Affidavit") stating he "paid each of Contractor's subcontractors, laborers, and materialmen in full for all labor and materials provided to Owner or Contractor for construction of the Improvements[.]" The Affidavit states that Stout agreed "to indemnify and hold Owner harmless for any loss or expense resulting from false or incorrect information in this affidavit." Stout completed the home and tendered it to the Obernuefemanns, who accepted and moved into the home but refused to pay for the "CUSTOMER AUTHORIZED EXTRAS" totaling $48,358.07.

Stout filed suit against the Obernuefemanns alleging causes of action for breach of contract, quantum meruit, unjust enrichment, and fraud in the inducement. Stout asserted that it had suffered $48,358.07 in damages and denied there was a facially valid Affidavit because the Obernuefemanns made false representations to induce Adam to sign the Affidavit, which included claiming they would pay the remaining expenses if Stout helped them close to avoid paying additional interest. The Obernuefemanns filed an Answer denying Stout's allegations and asserting (1) affirmative defenses of release, offset, and detrimental reliance; (2) Stout's claims were barred by the Proposal's contractual provisions; and (3) the Bills-Paid Affidavit required Stout to indemnify them from any claims for nonpayment from his vendors, including Flooring Design Center ("FDC").

3

FDC, which is not a party in this appeal, filed a Plea in Intervention, claiming it had a justiciable interest in the litigation because it supplied flooring materials and installation services at the Obernuefemanns' home at a cost of $54,490.39. FDC alleged causes of action for breach of contract, quantum meruit, and unjust enrichment and asserted it had sustained $29,490.39 in damages based on the Obernuefemanns' failure to pay for materials and services. FDC denied there was a facially valid Affidavit because the Obernuefemanns made false representations claiming they would pay all remaining expenses and allowances to induce Adam to sign it. FDC alleged that it justifiably relied on the Obernuefemanns' false representations which resulted in its damages.

The Obernuefemanns filed an Original Counter-Claim against Stout asserting claims for breach of contract/warranty based on Stout's alleged failure to complete a punch list detailing defects and incomplete work and to address warranty issues. Stout filed an Answer to the Counter-Claim, denying the Obernuefemanns' allegations, which it also asserted were barred by the statute of limitations, waiver, failure of consideration, and failure to perform conditions precedent.

The trial court conducted a jury trial. The record shows that the Obernuefemanns did not object to any of Stout's pre-admitted exhibits. Adam, the owner of Stout, testified that his Proposal with the Obernuefemanns was a lump sum contract to build their "custom home[]" for $433,370. Adam explained the Proposal

4

included allowances, so the Obernuefemanns immediately knew if they were over budget, and the Proposal contains a provision that the Obernuefemanns agreed to pay for any overages outside the lump sum. Adam testified the "[v]ery custom[]" home includes extras.

Concerning the Affidavit, Adam explained that the Obernuefemanns' bank contacted him before closing and told him the Obernuefemanns needed to "hurry up and close[]" to "lock the rate in." Adam explained "it was relentless e-mails," and the jury viewed emails Adam received from the Obernuefemanns' bank, including one stating they had to close by April 26 to avoid extension fees. Adam testified that he was "pretty much backed into a corner[,]" and assumed he was going to finish after closing. Adam explained the Affidavit is the final document indicating the contract has been fulfilled and all bills were paid for the scope of work under the contract amount and does not mean the overages were paid. Adam signed the Affidavit to help save the Obernuefemanns money by locking in their rate and to avoid delay charges. Adam testified that when he signed the Affidavit, the Obernuefemanns knew there were still overages they had to pay, and Adam understood that "they were going to pay their bills like they had always paid." Adam explained the Obernuefemanns assured him they would pay, and he trusted them so much that he signed the Affidavit, which probably released his mechanic's lien.

5

Adam testified that after he completed the home, the Obernuefemanns failed to pay the overages. Adam explained the overages were for interior finishes the Obernuefemanns requested that exceeded their allowances, and the vendors' invoices for those overages were preadmitted without objection. Adam testified he had some written change orders, but as they got closer to closing "it was hurry, hurry, hurry[]" and "'[j]ust do what she asks, and that's what we'll do[.]'" Adam had the impression the Obernuefemanns knew what the bills were because they picked the selections. Adam did not get change orders for all the overages because he trusted the Obernuefemanns to make him whole. Instead, he "got technicality'd[]" and had to sell a few things to make up for the money lost.

On cross-examination, Adam testified that he gave the Obernuefemanns the Customer Authorized Extras totaling $48,358.07 on May 10, 2018, but claimed "they were more aware of what was to be owed before I gave them this document." Concerning whether he complied with the Proposal's requirement for written change orders, Adam testified that he "did most of it, yes." Adam explained there were not written change orders for extras related to the light fixture and hardware allowance and plumbing allowance, because the Obernuefemanns got the quote directly from the vendor and "knew their extras." Adam also explained he did not get a written change order for the outdoor kitchen allowance because when he told Justin about the extra, Justin said, "'Go for it.'" Adam testified that the Obernuefemanns verbally

6

approved the extras concerning the cabinets, glazing, cedar beams, shiplap, and flooring, and while he agreed there were no written change orders, he stated there "was a shake of hands and let's go, go, go." Adam explained that the Obernuefemanns had notice from the vendors, who gave them a budget number, and when they shopped with the interior designer, they immediately knew their overages.

Concerning the Affidavit, Adam explained that he knew he had to sign the Affidavit so the Obernuefemanns could close and get their interest stopped. Adam testified that the Affidavit was not true because "we all . . . had an understanding," and "knew there was work to still be done on the Obernuefemanns' home." Adam testified that he did not pay FDC because it was Justin's signature on FDC's document. Adam acknowledged that the Affidavit states he would indemnify the Obernuefemanns from any claims for unpaid contractors. Adam explained that he paid the other contractors for the extras before he signed the Affidavit.

Adam testified that when he gave the Obernuefemanns the written document detailing the extra costs that they owed, Justin emailed him stating they did not authorize any change orders for extras and to please remove the over-budgeted items and replace them with items within their budget. Adam told the Obernuefemanns he did not understand and that he had the receipts for the extras. Adam testified that Justin told him he was not going to pay for the extras.

On redirect, Adam explained that Justin signed FDC's scope of work dated January 16, 2018, which included materials totaling $52,656.91. Adam explained that the materials in FDC's scope of work exceeded the Obernuefemanns' allowance for countertops and tile provided in the Proposal and stated there would be a butcher block countertop. Adam testified that he considered FDC's scope of work that Justin signed to be a change order.

Justin testified he was only aware of the two change orders they executed. Justin agreed he signed FDC's scope of work, which totaled $52,656.91 and states that FDC "requires 1/2 down and a signed scope of work before material can be ordered or scheduled for install. Final payment is due upon completion. . . ." Justin agreed FDC's scope of work was about $20,000 more than his allowances provided in the Proposal and that "[t]here's no additional allowances for those items." Justin also agreed the Proposal states the owner would pay the builder any excess of an item over the allowance amount. Justin testified he was unaware of his allowances, but he agreed the Proposal lists his allowances and that he and his wife were aware of them when they signed and reviewed the Proposal. Justin explained that he was not at FDC when Meagan and the designer, Lindsay Campbell ("Lindsay"), made the selections, and he was not aware there were any overages that he needed to pay. Justin testified that when he signed FDC's scope of work months later, FDC did not discuss any overages and only asked him to verify their selections.

8

Justin explained that Adam did not sign the Affidavit to help him lock in his interest rate, and he claimed Adam could have asked for more extensions if he needed it. Justin testified that Adam said they could close, and he had no knowledge of additional overages when Adam signed the Affidavit. Justin explained he was also not aware Meagan went over their budget when she picked fixtures at Moore Supply and Tri-Supply with Lindsay, who he claimed never told Meagan they were over budget. While Justin claimed he did not know he was deviating from the Proposal by requesting a butcher block kitchen island listed in FDC's scope of work, he agreed the Proposal only included a granite allowance. Justin testified that if they had known their selections were overages, they would have made different selections. Justin explained that when Adam requested payment for the overages after closing, he told Adam they never spoke about it.

Concerning the cedar beams that were not in the Proposal, Justin stated that Lindsay and Meagan thought they would look nice in the kitchen, but they only discussed them and were never told they would be extra. Justin admitted a builder would not put in cedar beams on his own, but he claimed deviations from the Proposal would only be extras if Adam told him it would be an extra. Justin agreed materials and labor are not free and that if something not in the Proposal costs more money, it would be an extra if they did not have savings in another area.

Justin testified that after he closed, FDC contacted him once and told him that "Adam hadn't paid them for a few houses[,] and that they needed me to pay him extra money so that way he would pay them." After reviewing one of his exhibits, Justin testified that FDC contacted them multiple times about payment, but he did not pay FDC because he "[did] not want to start paying Adam Stout's subcontractors because if I go down that road, I don't know where that would end." Justin explained that he fulfilled his contractual obligation to Stout and that "additional money was a frivolous lawsuit."

On cross-examination, Justin testified that Stout agreed to build his home for a lump sum and because his financing was limited to $400,000, he had to pay the difference, which amounted to $33,370. Justin stated that Stout offered them a designer to help Meagan pick out the finishings and that Adam told them he firmly believed in the written change order process because it protected him and us. Justin expected that any overages would be addressed in written change orders as provided in the Proposal.

Justin explained that he wanted to comply with the Proposal and receive prior notification of any changes so he could make the decision, and they only had one confrontation when a change was made without notice. Justin testified that he signed two change orders for insulation, appliances, and concrete during the build and other changes were made for no additional charge. Justin explained that the pricing of the

10

cabinets became an issue because Adam's quote did not include upper cabinets throughout the entire house, so they put in shelving and made changes to stay within the allowance. Justin testified that there was no change order for the cabinets or flooring. Justin also explained that emails showed that they were trying to cut the cabinet bid so they could keep the soft-close cabinets and stay within budget without paying extra.

Regarding closing, Justin testified that on March 26, 2018, Adam told him every change order was up-to-date, and at that point, FDC had installed the flooring, backsplash, and countertops. Justin testified that the Mechanics Lien Contract also states that Stout would not make or charge for any alteration in the plans unless the owner agreed in writing and that any alterations made without a written agreement would be considered performed at no additional charge. Justin never received written change orders for the countertops or backsplash.

On redirect, Justin testified that he expected Meagan to notify him if she selected finishes that were over their budget. Justin agreed that Adam did not sign the Mechanics Lien Contract that was in evidence and states "[a]ny alterations made without a written agreement will be considered performed under the original contract at no additional charge."

Terry Stringfellow ("Terry") testified that he was one of Stout's subcontractors that worked on the Obernuefemanns' home. Terry explained that

11

when he and Meagan walked through the home and discussed building cabinets and shelving, she changed the plans beside the fireplace and in the playroom, laundry room, kitchen pantry, and garage closet. Terry testified that Adam paid him for the cabinet and trim work. Terry explained that in his thirty plus years of experience, customers know that making changes to the plans will cost extra money.

On cross-examination, Terry stated he is not involved in change orders and that when a customer like Meagan asks him to do something he does not always clear it with Adam, but if he did, Adam would ask about the cost. Terry testified that he did not talk to Meagan about the extra cost because that is Adam's job.

Meagan testified that Lindsay helped her select items for the home at Tri-Supply, Moore Plumbing, and FDC. Meagan testified that Adam provided her a budget, but then explained that Adam gave Justin the budget only because she did not deal with any of the finances. Meagan testified Justin told her to stay in budget, and Lindsay "never told me once anything was not in my budget." Meagan then explained that she did not know her budget, but when she picked items, Lindsay told her what items were in her budget. Meagan testified she was "never aware that I went over my budget." Meagan agreed that despite the Proposal providing a carpet allowance and a fiberglass unit in the downstairs' shower, she decided to tile the entire house and the downstairs' shower to the ceiling, and she claimed that "no one ever told me any of this was out of my budget." Meagan testified that she and Justin

12

"talked a lot about the house[,]" but she did not remember if she asked him what their budget was.

Meagan testified she never saw the Proposal, which contained their allowances, and she agreed that it was not Adam's fault that Justin never showed her their budget. Meagan explained that they "did not know we had any extras." Regarding her conversations with Justin, Meagan testified that she was sure she and Justin discussed the budget. When asked how she got $22,000 over budget with FDC, she stated she never thought to ask.

On cross-examination, Meagan explained she never received a written agreement notifying her of extra charges for flooring. Meagan testified that she "wanted to be in our budget[,]" and Lindsay was employed by Adam and knew her budget when she helped her make the selections. On redirect, Meagan agreed that Lindsay told her some things were over her budget.

Lindsay, who currently owns FDC, testified that she was working freelance for Stout when she helped the Obernuefemanns with their home. Lindsay explained that she and Adam did not talk about the Obernuefemanns' budget, and she did not see the Proposal or know the numbers, but she knew that Adam's standard basic budget was in effect for their home. Lindsay explained that she has a general knowledge of what a typical home builder's budget allowances were for basic selections. Lindsay testified that it is the customer's responsibility to know their

13

budget, and Adam told her that the Obernuefemanns liked high-end materials, which they mostly chose.

Lindsay testified that during their first meeting, Meagan told her she wanted tile throughout the home. Lindsay explained that when she helped Meagan pick items at Tri-Supply and Moore Supply, both she and the salesperson advised Meagan about items Adam would typically put in his homes and about what items would be extra. Lindsay testified that when Meagan wanted extra hand-held shower heads, she told Meagan it was her decision to decide whether she wanted to pay extra for items.

Concerning the cabinets, Lindsay explained that when Meagan picked out extras, including soft-close doors and entire cabinets in the pantry, the man at the cabinet shop told her those would be extra. Lindsay testified that when the cabinet bid came back, Meagan told her that "they were going to regroup[]" because the bid "was a lot over the amount of what her cabinet bid was." Lindsay testified that Meagan mentioned the budget, appeared to be aware that there was one, and stated that the cabinets were about $15,000 to $20,000 over budget. Lindsay also recalled Meagan liking a light at Tri-Supply and saying it was as much as her whole lighting budget, and Lindsay told Meagan they would have to decide whether they wanted to pay for it, and she was "almost positive[]" they selected that light.

Lindsay testified that when she and Meagan went to FDC, she told Meagan that the flooring tile she wanted was over Adam's basic budget. Lindsay explained

14

that Justin signed FDC's scope of work, which was dated January 16, 2018, and Justin received an emailed copy showing their selections. Lindsay testified that it is "very common" for people to be outside their builder's budget, and she "had no indication that . . . they needed to stay in the budget, and it wasn't for me to decide at the end." Lindsay explained that she knew they had an issue about FDC's invoice when Adam told her Justin shut the door in his face and refused to pay. Lindsay testified that when Jan Campbell ("Jan"), the prior owner of FDC, tried to get the Obernuefemanns to pay the invoice, Justin refused. Lindsay also explained that to her knowledge, Stout did not have other unpaid invoices with FDC as Justin alleged.

On cross-examination, Lindsay explained that Jan still owns the Obernuefemanns' account because she did not assume that debt when she purchased FDC. Lindsay testified that Meagan knew she was "over budget for sure[,]" but "[p]robably [did] not know how much over budget." Lindsay explained it is normal practice to get the customer to sign the scope of work and that the overages are between them and the contractor. Lindsay testified that she would expect a contractor to comply with their contract, but in the construction business, she did not know many contractors who do not meet their customers' requests for little changes. Lindsay testified that she sent the Obernuefemanns FDC's scope of work dated January 16, 2018, which Justin signed authorizing FDC to order the materials, but the invoice was not due until the job was complete. Lindsay explained that as Stout's

subcontractor, FDC sent the invoice to Stout, which owned the bill and was required to pay its allowance, and the customer is required to pay the overages. Lindsay testified that Stout had not paid FDC's bill when Adam signed the Bills-Paid Affidavit on April 27, 2018.

Jan testified that she called the Obernuefemanns about the invoice many times, but they never answered or returned her calls. Jan explained she went by their home and asked Justin if he planned to pay their bill, and he told her no. Jan denied telling Justin that Adam had unpaid invoices from other projects. Jan testified that Adam had paid some of the invoice to help FDC. According to Jan, "all of my other customers, when they sign a scope of work, they have understood that they are responsible[,]" and Justin agreed to pay the overages. Jan explained that she considered FDC's scope of work that Justin signed to be a written change order.

On recall, Adam testified that although he did not sign the version of the Mechanic's Lien Contract that was in evidence, under normal circumstances he would have had to sign it for the Obernuefemanns to get their construction loan. Adam explained he went to the title company and signed when the construction loan was done.

As to the jury charge, the record shows the Obernuefemanns objected to Question 1 regarding whether the Obernuefemanns agreed to additional work/upgrades which were to be paid by them. The Obernuefemanns argued there

16

was uncontroverted evidence there was a valid contract between the parties that contemplated all issues, including disputes related to how extras would be documented and paid, and it was the trial court's obligation to rule on the terms of the contract and whether they were followed. The Obernuefemanns argued there was no evidence or factually insufficient evidence of any waiver of the requirement to obtain a written change order and that they were entitled to a directed verdict on Stout's claims because they were governed by the Proposal's change order provision, which Stout failed to follow. The Obernuefemanns also complained no evidence supported Question 2, a quantum meruit question, because the contract covered change orders or Question 3, the damages question, because there was no evidence any of the expenses were reasonable and customary for the same or similar products and services in Orange County, Texas. The trial court overruled the Obernuefemanns' objections to the jury charge.

The jury answered the three questions and found that (1) the Obernuefemanns agreed to additional work/upgrades which were to be paid by them; (2) the Obernuefemanns failed to comply with the agreement; and (3) $48,358.07 would fairly and reasonably compensate Stout for its damages resulting from the Obernuefemanns' conduct. The Obernuefemanns filed a Motion for Judgment Notwithstanding the Verdict, objecting to the jury's responses to Questions 2 and 3 because the uncontroverted evidence showed the Proposal and the Mechanic's Lien

17

Contract, and financing documents required any changes or additions in the home to be in writing and signed by the parties to be enforceable. The Obernuefemanns requested that the trial court deny Stout's Motion for Entry of Judgment, grant their motion, and enter a judgment awarding Stout zero damages and the Obernuefemanns' attorney's fees.

Stout filed a Response, arguing that the jury's verdict was based on evidence, which included FDC's Scope of Work and Invoice, text message between the Obernuefemanns and Adam, invoices from suppliers, and testimony that showed the Obernuefemanns acknowledged or requested in writing that Stout perform the extras which were outside the original budget. Stout argued the Obernuefemanns accepted performance and waived any argument that Stout failed to give them any written change orders. Stout also argued the Obernuefemanns did not assert a breach of contract claim which would have required it to assert certain affirmative defenses, and they could not replead matters in their post-trial motion. The trial court signed a Final Judgment incorporating the jury's verdict and awarding Stout $48,358.07 in damages.

## ANALYSIS

### Sufficiency of the Evidence

We first address the Obernuefemanns' complaint challenging the sufficiency of the evidence. *See* Tex. R. App. P. 47.1. In issue four, the Obernuefemanns

18

complain the trial court erred by submitting Question 3 concerning Stout's claimed damages, including sums Stout owed to its vendors and subcontractors. The Obernuefemanns argue there was insufficient evidence to support the requirement that the "extras" and "change orders" were "reasonable and necessary" and/or "usual and customary charges" for the same or similar products and services in the area. Stout argues the trial court did not err by submitting Question 3 because the appropriate measure of damages is expectancy, which does not require a showing of reasonableness or necessity. Stout also argues the Obernuefemanns did not preserve error on their factual sufficiency challenge because they failed to include their argument in a motion for new trial.

In a legal sufficiency challenge, we consider whether the evidence at trial would enable a reasonable and fair-minded factfinder to reach the verdict under review. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.* (citing *Bustamante v. Ponte*, 529 S.W.3d 447, 455-56 (Tex. 2017); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.

19

2003)). The record contains more than a mere scintilla of evidence when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.* (citing *King Ranch, Inc.*, 118 S.W.3d at 751). Conversely, the record contains less than a scintilla when the evidence offered to prove a vital fact's existence is "'so weak as to do no more than create a mere surmise or suspicion.'" *Id.* (quoting *King Ranch, Inc.*, 118 S.W.3d at 751). All the record evidence must be considered "'in the light most favorable to the party in whose favor the verdict has been rendered,'" and "'every reasonable inference deducible from the evidence is to be indulged in that party's favor.'" *Id.* (quoting *Bustamante*, 529 S.W.3d at 456); *see also Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). In our legal sufficiency review, we credit all evidence favorable to the jury's findings if a reasonable factfinder could; we disregard evidence that is contrary to the jury's findings unless a reasonable factfinder could not. *See City of Keller*, 168 S.W.3d at 827.

When reviewing a factual sufficiency challenge, we set aside the jury's finding only if, after considering and weighing all the record evidence relevant to the jury's finding, we determine that the credible evidence supporting the finding is so weak or so contrary to the overwhelming weight of all the evidence that the finding should be set aside and a new trial ordered. *See Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016); *Dow Chem. Co. v. Francis*, 46

20

S.W.3d 237, 242 (Tex. 2001). "Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another." *City of Keller*, 168 S.W.3d at 819. When provided with alternative theories, the jury is free to determine which to credit. *Gunn*, 554 S.W.3d at 677 (citing *Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 833 (Tex. 2014); *City of Keller*, 168 S.W.3d at 819). We assume the jury decided all credibility issues in favor of the verdict if reasonable human beings could do so. *City of Keller*, 168 S.W.3d at 819.

No evidence points must be preserved through one of the following procedural steps in the trial court: (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the issue to the jury; (4) a motion to disregard the jury's answer to a vital fact issue; or, (5) a motion for new trial. *Aero Energy, Inc. v. Circle C Drilling Co.*, 699 S.W.2d 821, 822 (Tex. 1985). A motion for new trial is required to preserve error on factual sufficiency. *See* Tex. R. Civ. P. 324(b)(2). Although the Obernuefemanns filed a Motion for Judgment Notwithstanding the Verdict, which preserved their legal sufficiency challenges presented in that Motion, they did not file a motion for new trial to preserve a complaint of factual insufficiency of the evidence to support a jury finding. Accordingly, we conclude the Obernuefemanns failed to preserve their factual sufficiency complaint for our review. *See id.*

21

Regarding their legal sufficiency challenge concerning damages, the Obernuefemanns' brief contains no appropriate citations to authorities supporting their argument that the trial court erred by submitting Question 3 because no evidence shows the amounts allegedly owed the Stout's vendors and subcontractors were "'reasonable and necessary' and/or the 'usual and customary charges' for the same or similar products and/or services in the area of the subject residential construction project." *See* Tex. R. App. P. 38.1(i) (stating brief must contain appropriate citations to authorities); *Grant v. Hope Vill. Apartments*, No. 09-09-00527-CV, 2010 WL 4262001, at *4 (Tex. App.—Beaumont Oct. 28, 2010, pet. denied) (mem. op.) (citations omitted) (stating appellate court is not required to brief appellant's argument to address its merits). Accordingly, the Obernuefemanns waived this argument on appeal by failing to satisfy the briefing requirements. *See id.* We overrule issue four.

## Evidentiary Issues

In issues one through three, the Obernuefemanns complain the trial court erred by admitting evidence they contend was in direct contradiction to the Proposal. Stout argues the Obernuefemanns failed to preserve their evidentiary complaints.

Evidentiary rulings are committed to the trial court's sound discretion. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012) (citing *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam)). We review

a trial court's ruling on the admission of evidence under an abuse of discretion standard of review. *See Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). We will uphold the trial court's decision if it is within the zone of reasonable disagreement. *Diamond Offshore Servs., Ltd. v. Williams*, 542 S.W.3d 539, 545 (Tex. 2018).

To preserve error for appellate review, the complaining party must make a timely objection and obtain a ruling. Tex. R. App. P. 33.1(a). The objection must provide the grounds for the ruling sought with enough specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context. *Id.* The record shows that the Obernuefemanns did not object during the trial to Stout's exhibits about which they now complain on appeal. Accordingly, we conclude the Obernuefemanns failed to preserve their evidentiary complaints for our review. *See id.* We overrule issues one through three.

## CONCLUSION

Having overruled each of the Obernuefemanns' issues, we affirm the trial court's judgment.

23

AFFIRMED.

JAY WRIGHT
Justice

Submitted on March 13, 2025
Opinion Delivered June 19, 2025

Before Golemon, C.J., Johnson and Wright, JJ.