**Opinion issued March 21, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————————

## NO. 01-17-00671-CV

———————————————

## LION COPOLYMER HOLDINGS, LLC, Appellant

## V.

## LION POLYMERS, LLC, Appellee

---

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-10394A**

---

## MEMORANDUM OPINION

Appellant, Lion Copolymer Holdings, LLC (the "Company"), challenges the

trial court's judgment, entered after a jury trial, in favor of appellee, Lion Polymers,

LLC ("LP"), on LP's breach-of-contact claim against the Company. In four issues,

the Company challenges the legal and factual sufficiency of the evidence supporting the jury's verdict and contends that the trial court erred in admitting certain evidence and in awarding LP pre-judgment interest and costs.

We modify and affirm in part and reverse and remand in part.

## Background

The Company, a Delaware Limited Liability Company, manufactures synthetic rubber for the automotive and construction industries. Pursuant to the amended "LLC Agreement" (the "Agreement"), under which the Company was formed, the Company's "members," such as LP, share in the Company's profits and proceeds through tiered distribution provisions, or "waterfalls," based on the type and quantity of units, or fractional membership interests in the Company, that each member holds. In 2007, the Company admitted LP as a member and issued it 1,237,500 Class 1 Preferred Units and 1,964,492 Class 3 Common Units. At issue in this case is the Company's distribution of proceeds related to LP's holdings of Class 3 units.

### *Pertinent Portions of the Agreement*

The Company, as a pass-through entity taxed as a partnership, allocates its profits and losses to each individual member, who then pays taxes on the amounts allocated. Because a member may incur tax liability on profits not actually

2

distributed, the Agreement, at section 6.01(d), provides for certain "Tax Advances" as follows, in pertinent part:

> On each Tax Distribution Date, the Company shall, to the extent the Board determines such amounts to be available for distribution, make distributions to the Members in such amounts as the Board determines are sufficient to satisfy the Members' projected estimated income tax liability with respect to the Company's income allocable to their Units for such period. . . . Such tax liability will be calculated as though each Member were an individual residing in the State of New York based upon the highest marginal income tax rates, taking into account U.S. federal, state, and local income taxes . . . , which the Board estimates are applicable, utilizing the respective rates for ordinary income or capital gains, depending on the characterization of the Company's estimated income for such period. Any distribution made to a member pursuant to this <u>Section 6.01(d)</u> shall be treated as an advanced distribution of, and shall reduce, the amounts next distributable to such Member pursuant to <u>Section</u> . . . <u>6.02</u>.

Section 6.02 of the Agreement governs how and to whom proceeds are to be paid after a "Recapitalization Transaction," defined as the financing or refinancing of debt secured by the assets of the Company in an amount in excess of $10,000,000, in the aggregate, and followed by the distribution of all, or a significant portion of, such amounts to the members existing as of such date. Section 6.02(1) generally provides:

> [U]pon a Recapitalization Transaction, after adjusting the Capital Accounts for all distributions made under Section 6.01 and all allocations under this Article 6, all available proceeds distributable to the Members shall be distributed to the Members as follows:
>
> (a)    First, to the Holders of Class 4 Common Units in an amount equal to the amounts owed to such Holders . . . .

3

(b)     Next, to the Holders of Class 1 Preferred Units until their Unpaid Class 1 Return is eliminated; . . . .

(c)     Next, to the Holders of Class 1 Preferred Units until their Unreturned Class 1 Capital is eliminated; . . . .

(d)     Thereafter, to the Holders of Class 2 Common Units, Class 3 Common Units, and Class 4 Common Units (but not the holders of Class 1 Preferred Units) pro rata in proportion to the number of such Units.

Thus, reading sections 6.01(d) and 6.02 together, the Company advances sufficient cash to each member to satisfy the member's estimated income tax liability and then recoups the advance from a subsequent non-tax distribution of proceeds under, as pertinent here, section 6.02 by reducing the amount of the distribution to the member.

***The Instant Suit***

On September 9, 2011, the Company, after a $300,000,000 Recapitalization Transaction, distributed $150,000,000 in proceeds to its members (the "2011 Distribution").   On March 7, 2013, after a $230,000,000 Recapitalization Transaction, the Company again distributed a portion of the proceeds to its members (the "2013 Distribution").  LP, disputing that it had received its proper share of the proceeds in the 2011 and 2013 Distributions, brought a breach-of-contract suit against the Company.  In its suit, LP alleged that the Company (1) had improperly withheld certain sums, as a "strike-price deduction," from LP's portion of the 2011 Distribution (the "strike-price claim") and (2) had withheld certain section 6.01(d)

4

tax advances twice—once from LP's portion of the 2011 Distribution and again from LP's portion of the 2013 Distribution (the "double-deduction claim").  The trial court granted summary judgment in favor of LP on its strike-price claim, and we affirmed, as modified, the trial court's judgment.  *See Lion Co-Polymers Holdings, LLC v. Lion Polymers, LLC*, No. 01-16-00848-CV, 2018 WL 3150863, at \*18 (Tex. App.—Houston [1st Dist.] June 28, 2018, pet. filed) (mem. op.).  The trial court severed LP's double-deduction claim into the instant suit.

In its second amended petition, LP asserted, with respect to its double-deduction claim, that the Company had breached the Agreement by deducting from LP's share of the 2011 Distribution tax advances in the amount of $361,295 attributable to the third and fourth quarters of 2011 that the Company had not yet paid to LP.  Subsequently, after the Company paid the advances to LP, it then deducted the same advances from LP's portion of the 2013 Distribution. LP explained that it had learned about the double-deduction through its deposition in the underlying strike-price suit of the Company's Tax Matter Member, Rich Furlin. LP notified the Company that, in support of its claim, it intended to introduce at trial a spreadsheet that Furlin created in February 2012 (the "February 2012 Spreadsheet") and his deposition testimony about the spreadsheet.  As discussed below, the Company moved to exclude the February 2012 Spreadsheet and "any testimony related to that spreadsheet."  The trial court denied the Company's motion.

5

*Trial*

At trial, Stephen Lyttleton, an owner and manager of LP, testified that, on September 9, 2011, he received a letter from Furlin describing LP's share of the 2011 Distribution, with respect to both its Class 1 and Class 3 units. The trial court admitted into evidence a bank notice of wire transfer, reflecting the Company's payment to LP for its Class 1 and Class 3 shares, combined. On September 13, 2011, Furlin sent Lyttleton a spreadsheet detailing how he had calculated LP's share. Lyttleton testified that Furlin's calculations were incorrect because none of the tax advances that LP had received in 2010 and prior to the date of the 2011 Distribution had been deducted, in accordance with section 6.01(d) of the Agreement.

In February 2012, Furlin, to correct the errors in the 2011 Distribution, compiled and sent to LP the February 2012 Spreadsheet. Lyttleton testified that the February 2012 Spreadsheet also contained errors. Although Furlin had properly deducted the tax advances that the Company had paid to LP prior to the 2011 Distribution, he had also improperly deducted future tax advances that the Company had not yet paid to LP. Specifically, the Company deducted a total of $1,964,492 in tax advances from LP's share of the 2011 Distribution attributable to its Class 3 units. Lyttleton testified that the total amount that the Company should have deducted was $1,603,197. Lyttleton testified that the difference, $361,295, was attributable to tax advances for the third and fourth quarters of 2011, which the

6

Company had not yet paid to LP as of the date of the 2011 Distribution. The trial court admitted into evidence the February 2012 Spreadsheet, which reflects that a total of $1,964,492 in "Article 6.01(d) Distributions," or tax advances, was deducted from the LP's share of the 2011 Distribution, including "Tax Allocations" in the amount of $313,328 and $47,967 for the third and fourth quarters of 2011, as follows:

| Total | Unapplied 8/2010 | 9/2010-8/2011 | Q3 2011 | Q4 2011 |
|---|---|---|---|---|
| 1,964,492 | 146,071 | 1,457,126 | 313,328 | 47,967 |

On February 21, 2012, Furlin sent Lyttleton an email stating that he had "applied the Article 6.01(d) distributions for [LP's] Class 3 Common to equal $1,964,492 in the September 2011 distribution detail schedule." Lyttleton testified that this was the last communication that he had with Furlin, until he attended Furlin's deposition, during which Furlin, in "his sworn deposition," "said he verified what he—what's in this spreadsheet, that what was deducted and how much in tax advances that they claimed that we had received, and it was the wrong amount. It was the same amount." On March 8, 2012, Lyttleton sent the Company a draft spreadsheet showing his understanding of how the tax advances should have been applied. He noted that he was trying to figure it out himself because he "wasn't getting any answers."

Lyttleton further testified that, on March 7, 2013, he received a letter from Company accountant David Wascom, notifying LP of the 2013 Distribution. In the letter, Wascom explained that the Company would be taking into account the article 6.01(d) tax advances since the 2011 Distribution. Lyttleton testified that, because the third and fourth quarter 2011 tax advances at issue were actually paid to LP after the date of the 2011 Distribution, the same advances that Furlin had previously deducted from LP's share of the 2011 Distribution were deducted a second time. Lyttleton testified that, based on the double deduction, LP had suffered damages in the amount of $361,295.

On May 25, 2012, LP, through its principal, Pete De Leeuw, sent an email to the Company's board of directors, Company manager Goradia Capital ("Goradia"), and Furlin, stating that LP's tax attorney, Robert Phillpott, had analyzed the actual distributions to understand whether the Agreement had been properly followed. The trial court admitted into evidence Phillpott's report and spreadsheets.

In his report, Phillpott stated that he had reviewed a Goradia spreadsheet dated April 17, 2012[1] and had concluded that there existed "material differences for all Members with respect to the amounts that should have been distributed to the Members through the 2011 [Distribution]." With respect to LP's tax advances, Phillpot concluded that LP, prior to a 2010 recapitalization transaction, had received

---

[1] The spreadsheet is not included in the appellate record.

8

cumulative tax advances in the amount of $238,086. And, between that date and the 2011 Distribution, LP had received cumulative tax advances in the amount of $2,375,013. The trial court admitted into evidence cancelled checks and bank records reflecting these amounts.

Lyttleton explained that Phillpott's amounts included LP's Class 1 and Class 3 units. Thus, to obtain the portion attributable solely to LP's Class 3 units, at issue in this case, such amounts must be multiplied by the portion of the total amount attributable to LP's Class 3 units, i.e., 61.35 percent.[2] Doing so results in $146,066 in cumulative tax advances attributable to LP's Class 3 units for 2010 and $1,457,070 in cumulative tax advances attributable to LP's Class 3 units through the date of the 2011 Distribution. Together, these total $1,603,136 in tax advances attributable to LP's Class 3 units that should have been deducted from LP's share of the 2011 Distribution. Lyttleton noted that these amounts approximated those that Furlin had stated in the February 2012 Spreadsheet for these same time periods. The issue, however, was that the February 2012 Spreadsheet went further and also deducted future advances.

---

[2]    The record shows that members, such as LP, owning more than one classification of membership interest, i.e., Class 1 and Class 3, have a single capital account, but the taxable income is allocated to each type of membership unit. Thus, LP's capital account reflected an ownership interest based on the sum of its Class 1 and Class 3 units, of which 38.65% was allocated to LP's Class 1 units and 61.35% was allocated to its Class 3 units.

Vijay Goradia, chairman of the boards of Goradia and the Company, testified, by videotaped deposition, that he "rel[ied] on Rich Furlin to do the calculations" pertaining to the Company's tax advances and distributions. He testified that Goradia manages the Company and that Furlin had worked for Goradia since it began managing the Company.

Furlin testified at trial that, as secretary of the Company and its Tax Matter Member, it was his responsibility to see that the distributions to members were correct. He noted that he was also a vice president of Goradia. He testified that he was "the person who calculated the 2011 Section 6.02 distribution that the Company paid." He admitted that the initial calculations supporting the 2011 Distribution to LP were incorrect because LP's tax advances for 2010 and through the 2011 Distribution had not been deducted, in accordance with the Agreement. He performed the recalculation of the 2011 Distribution in the February 2012 Spreadsheet, a file he titled: "Lion 2011 Distribution, Final Reallocation, February 2012."

Furlin testified that only $1,603,197 had been paid to LP as tax advances on its Class 3 units prior to the 2011 Distribution and that the Agreement did not authorize the Company to deduct future tax advances from its distributions. He admitted that he applied $1,964,492 in the February 2012 Spreadsheet because he had included $361,295 attributable to LP's third and fourth quarter 2011 tax

10

advances, which had not yet been paid. He explained that he used the incorrect deduction of $1,964,492 in the February 2012 Spreadsheet because the Company "had another lawsuit going on unrelated to this. And [he] thought that what [he] was supposed to do was put in that amount that was . . . being disputed in the other lawsuit." He added: "I thought that that was the right number to put in given what was transpiring. It was a mistake, and I was wrong."

Furlin testified, however, that the Company did not actually use the February 2012 Spreadsheet or the spreadsheets prepared by Lyttleton or Phillpott. Rather, the Company obtained its "final calculation" from its attorney, Corby Brooks. Furlin testified that, in June 2012, Brooks compiled a set of spreadsheets (the "June 2012 Spreadsheet"), which Brooks submitted to the Company attached to a letter titled, "Confidential Settlement Negotiations." Furlin explained that the June Spreadsheet was "used to determine how much people should have gotten in 2010 versus what they got in 2010, and how much they should have gotten based on the correct calculation in 2011 versus how much they did get in cash in 2011." Furlin later testified, however, that the June 2012 Spreadsheet was not the final schedule.

Furlin testified that the Company finalized its calculations in August 2012, determined that it had actually overpaid LP $1,331,655 in the 2011 Distribution, and resolved to recoup such overpayment by withholding certain sums from LP, as follows:

Q.     . . . . When did the Company actually complete its work with respect to trying to figure out how to adjust the distributions that had already been made to take into account these tax advances?

A.     It—it took until the beginning of August 2012 for us to know exactly what the right amounts of the final distribution should be.

Q.     All right. And how did you communicate that determination to Mr. Lyttleton?

A.     Well, there are—there are two ways. One is, each quarter, we knew people owed—we knew certain people owed money. So each quarter from December through the second quarter of 2012, we were taking out estimates of what we thought the final would be. So they knew that in—that in Q1—or the fourth quarter of 2012, their entire—that we were going to be make a repayment of $600,000. They knew in 20—in the first quarter we were making another 200—400,000. And that by the June tax distribution, we had withheld another 200,000.

So the sum of that all was $1.3 million. And then we sent [Lyttleton] that—all—and all the shareholders their notification of whether they were getting money or whether they had owed money. But everybody had had their payments already reduced by that time. But it took through August of 2012 to get everything finalized.

Thus, testified Furlin, there was no double-deduction of tax advances.

The trial court admitted into evidence the Company's spreadsheet (the "August 2012 Spreadsheet"). The August 2012 Spreadsheet states that LP received cumulative tax advances prior to August 2010 of $238,086; that LP received cumulative tax advances after August 2010 of $1,457,328; and that LP owed the Company a combined $1,331,655, of which $865,361 was attributed to its Class 3 units.

12

With respect to correlating the Company's spreadsheets with actual distributions to LP, Furlin testified:

Q.   You heard some assertions that this is all about following the money, and you have to tick and tie everything, and you have to show that everything ties to cash, and you should reconcile the bank accounts because the bank accounts will show that everything ticks and ties, right?

A.   That was what was said, yes.

Q.   But you admit that the final spreadsheet, whatever the final spreadsheet is, won't actually tie to what was actually distributed to all of the unitholders, would it?

A.   Well, these are deductions. These aren't how much was paid in cash.

Furlin noted that, although the Company, in its live answer in this case, states that it had "made $1,935,154 in Section 6.01 distributions" to LP, that was "wrong." He further explained that, although, in May 2015, he executed an affidavit[3] in this case stating that, prior to the 2011 Distribution, LP "received a total of over 1.9 million in Section 6.01 distributions related to its Class 3 units," he was including amounts paid for the entire month of September.

In the excerpts of his videotaped deposition presented to the jury at trial, Furlin testified that he was "the only one that made calculations that the Company used"; that the February 2012 Spreadsheet was the final spreadsheet that he compiled; and

---

[3]   The affidavit itself was not admitted into evidence.

that the "ultimate amount" withheld in tax advances from LP's share of the 2011 Distribution was "1 million 964."

Wascom, a certified public accountant from the firm Hannis T. Bourgeois, testified that he prepared tax allocations and returns for the Company. He testified that it was Furlin, and not Brooks, who created the spreadsheets from which the Company eventually made its 2011 Distribution to members, as follows:

> Q. So you don't know what the Company actually did in 2011 because you didn't review any of Furlin's spreadsheet calculations of the 2011 distribution, did you?
>
> A. Not at that time, but subsequently I did.
>
> . . . .
>
> Q. But you told me at the deposition that you didn't review any of them?
>
> A. I didn't review his calculations, but I have to be provided the calculations to know how much distributions each member gets in preparation of a tax return.
>
> Q. So it's your testimony that you looked at the spreadsheets, you just didn't check his calculations?
>
> A. And let's—let's be clear. Which spreadsheets are you referring to?
>
> Q. I'm referring to the spreadsheets that Mr. Furlin made to calculate the 2011 Section 6.02 distribution.
>
> A. I would have had to have seen those spreadsheets.
>
> Q. You looked at those spreadsheets?
>
> A. Yes.
>
> . . . .
>
> Q. *You agree with me that it was Rich Furlin who created the spreadsheets that calculated payments made to the members for Section 6.02 distributions that were eventually made, don't you?*

14

> A. *Yes.*
>
> Q. *Not Corby Brooks, somebody else. It was Rich Furlin, right?*
>
> A. *Correct.*

(Emphasis added.) Wascom later noted, however, that he had used Brooks's calculations, which he stated represented the final correction to LP's share of the 2011 Distribution, in preparing tax documents and that, according to Brooks, LP was overpaid in the 2011 Distribution and owed the Company $1.3 million. On March 7, 2013, Wascom sent a letter to LP stating that he was preparing the 2013 Distribution and had taken into account all section 6.01(d) tax advances since the 2011 Distribution, which included the third and fourth quarter 2011 tax advances.

Eugene Kenyon, the managing director of Goradia and member of the Company's board of directors, also testified that, based on August 2012 Spreadsheet, which he stated was the final spreadsheet, the Company withheld $1,331,655 from LP's 2011 Distribution.

In its charge, the trial court asked the jury to determine whether the Company "failed to comply with the [Agreement] by double deducting $361,295 in tax advances from LP" and, if so, to determine the amount of damages, if any, owed to LP. The jury answered that the Company had breached the Agreement and awarded damages to LP in the amount of $361,295. The trial court denied the Company's motion for judgment notwithstanding the verdict. The trial court entered a judgment on the verdict, awarding LP damages in the amount of $361,295. The trial court also

15

awarded LP pre-judgment interest in the amount of $66,072.44 through April 19, 2017, increasing by $49.49 per day until the date of judgment, May 24, 2017, and costs in the amount of $3,707.85.

## Sufficiency of the Evidence

In its first issue, the Company argues that that evidence is legally and factually insufficient to support the jury's verdict that the Company breached the Agreement and that LP was entitled to $361,295 in damages. The Company asserts that the "evidence conclusively established that the Company did not use the February 2012 spreadsheet, but did actually use the August 2012 spreadsheet."

### *Standard of Review and Legal Principles*

When a party challenges the legal sufficiency of the evidence to support an adverse finding on which it did not have the burden of proof, it must demonstrate that there is no evidence to support the adverse finding. *See Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). We will sustain a legal-sufficiency or no-evidence challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) that rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) that the evidence offered to prove a vital fact is no more than a scintilla, or (4) that the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review,

16

a "court must consider evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it." *Id*. at 822. Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. They may choose to believe one witness and to disbelieve another. *Id.* Reviewing courts may not impose their own opinions to the contrary. *Id.* "Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." *Id.*

If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then factfinders must be allowed to do so. *City of Keller*, 168 S.W.3d at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id*.

When a party challenges the factual sufficiency of the evidence supporting a finding, we review all of the evidence that supports or contradicts the factfinder's determination in a neutral light and set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). Again, the factfinder is the sole judge of the witnesses' credibility and may choose to believe one witness over another. *See Zenner v. Lone Star Striping & Paving, L.L.C.*, 371 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

## *Breach and Damages*

To prevail on its breach-of-contract claim, LP was required to establish (1) that a valid contract existed between the parties; (2) that LP tendered performance or was excused from doing so; (3) that the Company breached the terms of the contract; and (4) that LP sustained damages as a result of the Company's breach. *West v. Triple B Servs., LLP*, 264 S.W.3d 440, 446 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Here, neither party argues that there was not a valid contract between the parties or that LP failed to tender performance. The Company asserts, rather, that the evidence is insufficient to support the jury's verdict that the

18

Company breached the Agreement by deducting the same tax advances twice and that LP incurred damages in the amount of $361,295.

As its evidence that the Company breached the terms of the Agreement by withholding future tax advances from the 2011 Distribution, LP presented section 6.01(d) of the Agreement which provides, in pertinent part:

> On each Tax Distribution Date, the Company shall, to the extent the Board determines such amounts to be available for distribution, make distributions to the Members in such amounts as the Board determines are sufficient to satisfy the Members' projected estimated income tax liability with respect to the Company's income allocable to their Units for such period. . . . Any distribution made to a member pursuant to this Section 6.01(d) *shall be treated as an advanced distribution of, and shall reduce, the amounts **next** distributable to such Member* pursuant to Section . . . 6.02.

(Emphasis added.) Thus, the parties agreed that the Company would advance sufficient cash to LP to satisfy LP's estimated income tax liability and then recoup these tax advances from LP in a *subsequent* non-tax distribution of proceeds by reducing the amount it paid to LP. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005) (holding that we give contract terms their plain, ordinary, and generally accepted meaning).

The record shows that the Company paid the 2011 Distribution to LP on September 9, 2011. It is undisputed that Furlin, in September 2011, provided LP with the calculations underlying the 2011 Distribution and that these calculations

19

were incorrect because none of the Company's previous tax advances to LP had been deducted, in accordance with section 6.01(d).

Furlin then prepared the February 2012 Spreadsheet to correct the errors. The February 2012 Spreadsheet, which the trial court admitted into evidence,[4] shows that the Company deducted $1,964,492 in tax advances from LP's share of the 2011 Distribution. An excerpt from the spreadsheet shows that this amount included taxes attributable to the third and fourth quarters of 2011, in the amount of $313,328 and $47,967, respectively, for a total of $361,295:

| Total | Unapplied 8/2010 | 9/2010-8/2011 | Q3 2011 | Q4 2011 |
|---|---|---|---|---|
| 1,964,492 | 146,071 | 1,457,126 | 313,328 | 47,967 |

On February 21, 2012, Furlin sent Lyttleton an email stating that he had "applied the Article 6.01(d) distributions for [LP's] Class 3 Common to equal $1,964,492 in the September 2011 distribution detail schedule." Furlin testified that getting to the $1,964,492 necessarily required a "reach into the future."

The record shows, and the Company states in its brief, that the Company paid LP its third quarter 2011 tax advance on September 15, 2011 and paid LP its fourth quarter 2011 tax advance in January 2012. Thus, at the time of the 2011 Distribution, the Company had not yet paid tax advances to LP for the third and fourth quarters

---

[4]    On appeal, the Company challenges the admissibility of Furlin's testimony about the February 2012 Spreadsheet. It does not challenge the admissibility of the February 2012 Spreadsheet itself.

20

of 2011. The parties do not dispute that the terms of the Agreement did not authorize the Company, in making distributions of proceeds, to reach into the future and deduct future tax advances.

Furlin admitted that, prior to the 2011 Distribution, only $1,603,197 had been paid to LP as tax advances on its Class 3 units. He testified that he applied the $1,964,492 amount because the Company "had another lawsuit going on unrelated to this. And [he] thought that what [he] was supposed to do was put in that amount that was . . . being disputed in the other lawsuit." He added: "I thought that that was the right number to put in given what was transpiring. It was a mistake, and I was wrong."

Furlin testified, however, that the amount stated in the February 2012 Spreadsheet was "not the ultimate amount that was actually distributed." He testified that "the ultimate distribution" was "finalized" in "April of 2012"; that the Company "got calculations from" Brooks in "May and June 2012 that were used for the final calculation"; and that the Company did not use Brooks's schedule but applied "the final August 2012 schedule."

Furlin further testified at trial, however, that he was "the person who calculated the 2011 Section 6.02 distribution that the Company paid." He testified that the Company, in its live answer in this case, states that it had "made $1,935,154 in Section 6.01 distributions" to LP, although he disputed its accuracy. He explained

21

that, although, in May 2015, he executed an affidavit in this case stating that, prior to the 2011 Distribution, LP "received a total of over 1.9 million in Section 6.01 distributions related to its Class 3 units," he was including amounts paid for the entire month of September.

Moreover, in the excerpts of his videotaped deposition presented to the jury at trial, which we hold below that the trial court did not err in admitting, Furlin testified that he was "the only one that made calculations that the Company used"; that the February 2012 Spreadsheet was the final spreadsheet that he compiled; and that the "ultimate amount" withheld in tax advances from LP's share of the 2011 Distribution was "1 million 964."

Wascom testified that it was Furlin who created the spreadsheets and calculated the payments "that were eventually made," as follows:

> Q. I'm referring to the spreadsheets that Mr. Furlin made to calculate the 2011 Section 6.02 distribution.
> A. I would have had to have seen those spreadsheets.
> Q. You looked at those spreadsheets?
> A. Yes.
>
> . . . .
>
> Q. *You agree with me that it was Rich Furlin who created the spreadsheets that calculated payments made to the members for Section 6.02 distributions that were eventually made, don't you?*
> A. *Yes.*
> Q. *Not Corby Brooks, somebody else. It was Rich Furlin, right?*
> A. *Correct.*

22

(Emphasis added.) Wascom later testified, however, that he had used Brooks's spreadsheet, which he stated represented the final correction to LP's 2011 Distribution, in preparing certain tax documents. Kenyon also testified that the August 2012 Spreadsheet was the final spreadsheet.

"It is the province of the jury to resolve conflicts in the evidence, and when reasonable jurors could resolve conflicting evidence either way, we presume they did so in accordance with the verdict." *Gunn v. McCoy*, 554 S.W.3d 645, 665 (Tex. 2018); *City of Keller*, 168 S.W.3d at 820. The factfinder is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another. *See City of Keller*, 168 S.W.3d at 819.

Here, the jury could have reasonably chosen to believe Goradia and Furlin's testimony that Furlin was in charge of calculating the distributions to members and ensuring their accuracy, and it could have chosen to believe Furlin's trial testimony that he was "the person who calculated the 2011 Section 6.02 distribution that the Company paid" and that the February 2012 Spreadsheet was the last set of calculations that he prepared. The jury also could have reasonably chosen to credit Wascom's testimony that it was Furlin who "created the spreadsheets that calculated the payments made to the members for the section 6.02 distributions that were eventually made."

23

Further, from the evidence and testimony, the jury could have reasonably concluded that only $1,603,197 had been paid to LP as tax advances on its Class 3 units prior to the 2011 Distribution; that the Agreement did not authorize the Company to deduct future tax advances from its distributions; and that Furlin applied $1,964,492 in the February 2012 Spreadsheet because he had included $361,295 attributable to LP's third and fourth quarter 2011 tax advances, which had not yet been paid.

Although Furlin testified that the $1,964,492 stated in the February 2012 Spreadsheet was "not the ultimate amount that was actually distributed" and that "the ultimate distribution" was later "finalized" in "the final August 2012 schedule," this testimony was impeached by Furlin's deposition testimony that he was "the only one that made calculations that the Company used"; that the February 2012 Spreadsheet was the final spreadsheet that he compiled; and that the "ultimate amount" withheld in tax advances from LP's share of the 2011 Distribution was "1 million 964." Also, Furlin testified that, long after the events, in May 2015, he executed an affidavit in this case stating that, prior to the 2011 Distribution, "[LP] received a total of over 1.9 million in Section 6.01 distributions related to its Class 3 units."

Finally, Lyttleton and Wascom testified, and the parties do not dispute, that the Company also deducted from LP's share of the 2013 Distribution these same

third and fourth quarter 2011 tax advances. Lyttleton testified that, based on the $313,328 and $47,967 tax advances having been deducted twice, LP was damaged in the amount of $361,295.

From the evidence, the jury could have reasonably concluded that the Company breached the Agreement by twice deducting $361,295 in tax advances from LP's distributions and that LP was damaged in the amount of $361,295.

The Company asserts that the evidence of the parties' continued discussions after the February 2012 Spreadsheet and the existence of subsequent spreadsheets "conclusively establishes that the Company used the August 2012 Spreadsheet." The Company asserts that "no reasonable juror could disregard the fact that so many later spreadsheets were exchanged between the parties." To prevail on appeal, the Company is required to demonstrate that this evidence *conclusively* establishes the opposite of a vital fact. *See Exxon Corp.*, 348 S.W.3d at 215. The ongoing nature of the dispute, on its own, however, does not conclusively establish that the February 2012 Spreadsheet was not ultimately used or that the third and fourth quarter 2011 tax advances were not twice deducted from LP's distributions. Furlin, himself, testified that each of the subsequent spreadsheets by Lyttleton, Phillpott, and Brooks were not used. Although Furlin, Wascom, and Kenyon testified that the Company used the August 2012 spreadsheet, their testimony was inconsistent, and the jury could have reasonably discredited such testimony. *See City of Keller*, 168 S.W.3d

25

at 819. When, as here, the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then factfinders must be allowed to do so. *See id.* at 810.

The Company also asserts that LP's bank records conclusively establish that the August 2012 Spreadsheet was used and that no double-deduction occurred. The tax advances that the Company references in its brief, however, took place prior to the 2011 Distribution. Such prior advances do not conclusively establish that the subsequent tax advances at issue were not deducted. Alignment with actual prior tax distributions supports, but does not conclusively establish, that the August 2012 calculations were actually applied. Moreover, Furlin testified that, because the Company made further deductions, the bank records of the distributions in this case will not correlate with any of the spreadsheets.

The Company asserts that, between January 2010 and March 8, 2013, it paid LP $19,719,245.27 and that there is no evidence that the total amount that it owed LP differed from that amount. LP's burden at trial, however, was limited to presenting evidence supporting its claim for damages in the amount of $361,295.

Considering the evidence in the light most favorable to the verdict and indulging every reasonable inference that would support it, we conclude that there is more than a scintilla of evidence to support the jury's findings that the Company breached the Agreement by twice deducting the tax advances applicable to the third

and fourth quarters of 2011 and that LP suffered damages in the amount of $361,295. *See Exxon Corp.*, 348 S.W.3d at 215 (holding that party challenging legal sufficiency of evidence to support adverse finding on which it did not have burden of proof must demonstrate that no evidence supports adverse finding); *City of Keller*, 168 S.W.3d at 810. We hold that the evidence is legally sufficient to support the jury's findings.

We hold that the Company's factual-sufficiency challenge is inadequately briefed. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities . . . ."). The Company, in its brief, argues only that there is no evidence to support the jury's findings. With respect to its factual sufficiency challenges, the Company asserts only:

- "Alternatively, for these same reasons, the evidence is so weak that it is factually insufficient to support a finding that the Company owed [LP] any money; reversal and a new trial are therefore warranted."

- "Alternatively, the evidence of a double deduction and the amount owed is so weak that it is factually insufficient; reversal and a new trial are therefore warranted."

- "Alternatively, the evidence supporting the jury's findings is so weak and so contrary to the overwhelming weight of all the evidence that the jury's verdict should be set aside and a new trial ordered because it is factually insufficient."

Beyond these bare assertions, the Company provides no substantive argument in support of its conclusions. *See id.* Accordingly, we conclude that the issue has been inadequately briefed and that error, if any, is waived. *See Lowry v. Tarbox*, 537

27

S.W.3d 599, 614 (Tex. App.—San Antonio 2017, pet. denied) (holding factual sufficiency challenge waived for inadequate briefing because appellants argued only that there was no evidence to support jury's finding); *City of Hous. v. Levingston*, 221 S.W.3d 204, 217 n.9 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding "any points concerning factual sufficiency were inadequately briefed" because, although City, in "Summary of the Argument" portion of its brief, asserted that evidence was "alternatively, 'factually insufficient,'" and, in "Argument" portion of its brief, asserted that evidence was factually insufficient to support jury's award of damages and was "against the overwhelming weight of the evidence," City made no substantive argument in support of its conclusion).

**Admission of Evidence**

In its second issue, the Company argues that the trial court abused its discretion in admitting Furlin's "deposition testimony on the February 2012 spreadsheet." The Company asserts that Furlin's deposition testimony "had almost no probative value because it was based on an incorrect premise supplied by [LP's] counsel." Further, any probative value of the testimony was outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury because the jury "was not equipped to evaluate the probative force of deposition testimony procured through a misrepresentation by [LP's] counsel." *See* TEX. R. CIV. P. 402, 403.

28

### Standard of Review and Principles of Law

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007). A trial court abuses its discretion if it rules arbitrarily or unreasonably or without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). We will uphold a trial court's evidentiary ruling if it is supported on any legitimate ground, even if such ground was not raised in the trial court. *Hooper v. Chittaluru*, 222 S.W.3d 103, 107 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

We will not reverse an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment or prevented a proper presentation of the appeal. *See* TEX. R. APP. P. 44.1(a); *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467, 474 (Tex. 1998). A successful challenge to a trial court's evidentiary rulings typically requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). Any "[e]rror in admitting evidence is generally harmless if the contested evidence is merely cumulative of properly admitted evidence." *Fairmont Supply Co. v. Hooks Indus., Inc.*, 177 S.W.3d 529, 532 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); *see*

29

*also Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004) (holding that even if trial court errs in admitting certain testimony, such error is rendered harmless and deemed waived if objecting party allows same or similar evidence to be admitted without objection).

Relevant evidence is presumed to be admissible. *See* TEX. R. EVID. 402. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. TEX. R. EVID. 403; *see Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 544 (Tex. 2018).

*Analysis*

The Company complains of the following colloquy between LP's counsel and Furlin during Furlin's deposition:

> Q. *. . . I'm going to hand you [the February 2012 Spreadsheet]. Do you know what this is?*
>
> A. *Yes.*
>
> Q. *What is it?*
>
> A. *I can't validate this is the final because I don't—you know, if this matches exactly what was the final distribution, but this is the calculation of the September 2011 distribution following the waterfall as it was intended and comparing it to what we actually did in 2011.*

30

Q. . . . . You can see the file name at the bottom . . . . *And then the file name I believe is Lion 2011 Distribution Final Reallocation February 2012.XLXS. Is that—is this the final spreadsheet you did?*

A. *I would say it probably is because that's how I would have named it.*

Q. *Would there have been one you did after February of 2012?*

A. *I don't recall. Of course, sometimes final is final version 1, version . . .*

Q. *I totally understand. I've been looking at this as if it was the final, but I want to make sure it is the final. <u>This is the—I'll represent to you that in the spreadsheets that have been produced to us, this is the final dated spreadsheet we have</u>.*

A. *Then okay.*

Q. But again, I want to make sure this is the final because I want to make sure I have your numbers that form the basis of everything you've done here.

A. Okay.

Q. *So if this is the final, this should tie to what was actually distributed to all of the unit holders, right?*

A. *No.*

Q. Why not.

A. There were two parts. One was the 2010 recalculation and the 2011 recalculation. It was the sum of those. It's a zero sum gain [sic]. So some people were overpaid, some people were underpaid. We did 2010 and 2011 and summed up the amounts and said okay. But the sum, who was overpaid, who was underpaid.

Q. Fair enough. So for [LP's] Class 3 units, because they only received a distribution in the 2011 distribution, this would show the amount that they received in the 2011 distribution only, right?

A. This would show what they were—should have received and compared to what they did receive.

Q. *Right. This is the ultimate amount. I know there was some after-the-fact changes that were made to make sure the ultimate cash*

31

> *flow movements were correct. But this is the ultimate amount of their distribution. Is that fair to say?*
>
> A.  *Yes.*
>
> . . . .
>
> Q.  At the time the 2011 distribution was calculated, 1.964 million was deducted from [LP] as [an] applied article 6.01(d) distribution, right?
>
> A.  Correct.
>
> Q.  In reality, less than that had actually been distributed under 6.01(d) as tax advances to [LP], right?
>
> A.  Right, but you can't look at one side of it. . . .
>
> Q.  But the answer to my question is yes, right?
>
> A.  The answer is yes, but you're—yes.
>
> . . . .
>
> Q.  *And you did withhold the 1 million 964?*
>
> A.  *That's correct.*

(Emphasis added.)

Specifically, the Company complains about the portions of Furlin's testimony, italicized above, which were played for the jury. The Company argues that such testimony had "almost no probative value" and constituted "extremely weak evidence" because they were induced by a misrepresentation by LP's counsel, underlined above, that the February 2012 Spreadsheet was "the final dated spreadsheet we have." It argues that the admission of these portions of Furlin's deposition testimony was harmful because it "constitutes the only direct evidence that the Company used the [February 2012 Spreadsheet] or deducted the third and fourth quarter 2011 tax advances consistent with that spreadsheet."

32

The testimony at issue is relevant because it has a tendency to make a fact of consequence, i.e., whether the $361,295 that Furlin included in the February 2012 Spreadsheet was ultimately withheld from LP's share of the 2011 Distribution, more or less probable than it would be without the evidence. *See* TEX. R. EVID. 401.

The trial court further could have reasonably concluded that the inherent probative force of Furlin's testimony was considerable, because it served as evidence that he used the February 2012 Spreadsheet and deducted the third and fourth quarter 2011 tax advances in accordance. *See* TEX. R. EVID. 403.

Next, the trial court could have reasonably concluded that the testimony at issue did not have a tendency to suggest a decision on an improper basis. *See id.* Examining the testimony at issue, as emphasized below, reflects that LP's counsel was attempting to ascertain whether the February 2012 Spreadsheet was the final spreadsheet *that Furlin compiled*:

> Q.     . . . . Is that—is this the final spreadsheet *you did?*
>
> A.     I would say it probably is because that's how I would have named it.
>
> Q.     Would there have been one *you did* after February of 2012?
>
> A.     I don't recall. . . .
>
> Q.     *I totally understand.  I've been looking at this as if it was the final, but I want to make sure it is the final.  This is the—I'll represent to you that in the spreadsheets that have been produced to us, this is the final dated spreadsheet we have.*
>
> A.     *Then okay.*

Q. But again, I want to make sure this is the final because I want to make sure I have *your numbers* that form the basis of everything *you've done* here.

A. Okay.

(Emphasis added.)

The trial court could have reasonably concluded that Furlin's testimony that the February 2012 Spreadsheet was the final spreadsheet he compiled was not procured by misrepresentation. Although the evidence was prejudicial, it was not unfairly prejudicial. "Testimony is not inadmissible on the sole ground that it is 'prejudicial' because in our adversarial system, much of a proponent's evidence is legitimately intended to wound the opponent." *Diamond Offshore Servs.*, 542 S.W.3d at 549 (internal quotations omitted). "Rather, *unfair* prejudice is the proper inquiry." *Id.* "'Unfair prejudice' within its context means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *Id*. There being no misrepresentation, no improper basis is shown.

Next, because the complained-of portions of Furlin's testimony relate directly to the heart of the dispute, it did not have a tendency to confuse or distract the jury from the main issues in the case. Further, there being no misrepresentation as the Company asserts, the trial court could have reasonably concluded that the jury was equipped to evaluate the probative force of Furlin's testimony and that it was unlikely to confuse or mislead the jury. *See* TEX. R. CIV. P. 403.

34

We conclude that the probative value of the complained-of portions of Furlin's deposition testimony was not substantially outweighed by the danger of unfair prejudice or a tendency to confuse or mislead the jury. *See id.* We hold that the trial court did not abuse its discretion in admitting the complained-of portions of Furlin's deposition testimony.

Accordingly, we overrule the Company's second issue.

### Prejudgment Interest

In its third issue, the Company asserts that the trial court erred in assessing prejudgment interest because it used an incorrect accrual date. The Company argues that the trial court erred by calculating prejudgment interest beginning on September 3, 2013, which was 180 days after the Company notified LP of the 2013 Distribution, because the Company did not receive notice of LP's double-deduction clam until LP filed its amended petition on October 30, 2015. *See* TEX. FIN. CODE § 304.104.

Subject to exceptions not applicable to the instant case, "prejudgment interest accrues on the amount of a judgment during the period beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered." *Id.*; *see also Tex Star Motors, Inc. v. Regal Fin. Co.*, 401 S.W.3d 190, 203–04 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("[P]rejudgment interest accrues beginning on the 180th day after the date the defendant receives written notice of a

claim or on the date suit is filed, whichever occurs first."). "A claim is a demand for compensation or an assertion of a right to be paid." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998) (internal quotations omitted); *Wheelbarger v. Landing Council of Co–Owners*, 471 S.W.3d 875, 892 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). A defendant has notice of a claim for purposes of prejudgment interest only if the plaintiff's written notice communicates that the plaintiff is claiming a right to compensation and provides enough information that the defendant could plausibly settle the claim without incurring interest. *Wheelbarger*, 471 S.W.3d at 892; *see also Owens–Ill., Inc. v. Estate of Burt*, 897 S.W.2d 765, 769 (Tex. 1995). The relevant date is that on which the plaintiff asserted the claim that ultimately results in a recovery. *Wheelbarger*, 471 S.W.3d at 893. When a plaintiff first asserts such claim in an amended petition, prejudgment interest begins to accrue on the date of the amended petition. *Id.*

Here, the trial court, in its judgment, awarded LP prejudgment interest "on the actual damages awarded at a rate of 5% from September 3, 2013, for the prosecution of this case through judgment in the amount of $66,072.44 through April 19, 2017, which amount shall increase by $49.49 per day until the date this judgment is signed [May 24, 2017]."

The Company asserts that September 3, 2013 represents the 180th day after the date of the March 7, 2013 Distribution. However, it did not receive written notice

36

of LP's double-deduction *claim* until October 30, 2015, when LP first raised the claim in its second amended petition. *See* TEX. FIN. CODE § 304.104; *see also Tex Star Motors, Inc.*, 401 S.W.3d at 203–04 ("[P]rejudgment interest accrues beginning on the 180th day after the date the defendant receives *written notice of a claim or* on the date suit is filed, whichever occurs first." (emphasis added)).

Again, the relevant date is that on which the plaintiff asserted the claim that ultimately results in a recovery. *Wheelbarger*, 471 S.W.3d at 893. The record shows that September 3, 2013 is the 180th day after *the Company notified LP* of the 2013 Distribution and that LP did not raise its double-deduction claim in its original petition. Rather, LP, in its second amended petition, alleged that the Company "breached the [Agreement] when the Company deducted tax advances from the third and fourth quarters of 2011 from both the 2011 Distribution and another distribution in 2013," and LP demanded damages and accrued interest. At trial, the jury was asked: "Did the Company fail to comply with the LLC Agreement by double deducting $361,295 in tax advances from [LP]?" The jury answered: Yes. And, it awarded LP damages in the amount of $361,295. The trial court entered judgment for LP in accordance with the jury's verdict. Thus, the date upon which LP's claim for prejudgment interest began accruing is October 30, 2015, when LP amended its petition to include its double-deduction claim. *See id.*; *see also Tex Star Motors, Inc.*, 401 S.W.3d at 204 (holding that when plaintiff first asserted claims upon which

37

it later recovered in amended petition, defendant lacked notice of claims until filing of amended petition and plaintiff entitled to prejudgment interest only from date of amended petition).

LP asserts that it first gave written notice of its claim to the Company on November 4, 2011, when it notified the Company by email that the tax advance calculations in the 2011 Distribution were incorrect, and in 2012 emails from Lyttleton to Furlin and Wascom regarding same. However, these 2011 and 2012 communications precede the 2013 Distribution and do not assert a claim for compensation based on the Company having twice deducted the same tax advance in 2011 and again in 2013, the claim that ultimately resulted in LP's recovery. *See Wheelbarger*, 471 S.W.3d at 893; *see also Tex Star Motors, Inc.*, 401 S.W.3d at 204.

We hold that the trial court erred in assessing prejudgment interest beginning on September 3, 2013, rather than beginning on October 30, 2015. Accordingly, we sustain the Company's third issue.

### Costs

In its fourth issue, the Company argues that the trial court erred by taxing specific costs in the judgment and by including in its award costs for copies of deposition transcripts, which are not taxable.

In response to a request for an award of costs, the trial court's role is to "adjudicate which party or parties is to bear the costs of court, not to determine the

correctness of specific items." *See Madison v. Williamson*, 241 S.W.3d 145, 158 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (holding trial court determines who is "successful" party and entitled to costs). Thus, the judgment "should not state the amount taxed as costs, but only that costs are awarded against a certain party." *Diggs v. VSM Fin., L.L.C*., 482 S.W.3d 672, 674 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *see also* TEX. R. CIV. P. 131; *see, e.g.*, *Star Operations, Inc. v. Dig Tech, Inc*., No. 03-15-00423-CV, 2017 WL 3263352, at *2 (Tex. App.—Austin July 27, 2017, pet. denied) (mem. op.) ("The final judgment included an award of court costs, 'including the cost of deposition transcripts and subpoenas necessarily obtained for use in this suit.").

Taxing the costs, as distinguished from adjudicating the costs, is a ministerial duty of the clerk. *Diggs*, 482 S.W.3d at 674; *see also* TEX. R. CIV. P. 129, 149, 622. Accordingly, the successful party at trial must submit a record of its court costs to the court clerk, either before or after the judgment is entered, so that the clerk can perform its ministerial duty and tax costs in accordance with Texas Rule of Civil Procedure 622. *Madison*, 241 S.W.3d at 158; *see also* TEX. R. CIV. P. 622 ("The clerk of the district or county court or the justice of the peace, as the case may be, shall tax the costs in every case in which a final judgment has been rendered . . . .").

Thereafter, to the extent that a party wishes to complain about the court clerk's taxation of any specific cost, the remedy is a motion to re-tax costs in the trial court.

*Gumpert v. ABF Freight Sys., Inc*., 312 S.W.3d 237, 239 (Tex. App.—Dallas 2010, no pet.) ("A party that wishes to challenge items *contained in the clerk's bill of costs* must file a motion to retax costs," and such should "stat[e] which items should have been included in the bill of costs or which items should have been excluded." (emphasis added)). A motion to re-tax costs "confronts the correctness of the clerk's ministerial calculations" and "is the proper method for correcting errors such as miscalculating the cost of an item or billing an item that is not statutorily taxable." *Campbell v. Wilder*, 487 S.W.3d 146, 152 (Tex. 2016); *see also Gumpert*, 312 S.W.3d at 241–42 (holding that trial court erred by denying motion to retax costs because recovery of costs to obtain copies of deposition transcripts not authorized by statute or rule). Because the taxing of costs is a ministerial duty of the clerk, the motion may be filed even after the case has been disposed of on appeal, so long as it is filed before the mandate issues and the costs are paid. *Operation Rescue–Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc*., 937 S.W.2d 60, 87 (Tex. App.—Houston [14th Dist.] 1996), *aff'd as modified*, 975 S.W.2d 546, 570 (Tex. 1998); *see Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc*., No. 03-10-00826-CV, 2014 WL 6705741, at *4–5 (Tex. App.—Austin Nov. 14, 2014, no pet.) (mem. op.) (citing *Reaugh v. McCollum Exploration Co*., 167 S.W.2d 727, 728 (Tex. 1943) (holding that motion to retax costs should be filed in court in which costs accrue and, thus, appellate court lacks jurisdiction to retax district court costs)).

Here, LP asserts that the Company waived this issue by not filing a motion to re-tax costs. The record before us, however, does not establish that LP has submitted a record of its costs to the district clerk so that the clerk can perform its ministerial duty to tax costs. *See Madison*, 241 S.W.3d at 158 (successful party at trial must submit record of its court costs to court clerk, either before or after judgment is entered, so that clerk can perform its ministerial duty and tax costs in accordance with Rule 622).; *see also* TEX. R. CIV. P. 622 ("The clerk of the district or county court or the justice of the peace, as the case may be, shall tax the costs in every case in which a final judgment has been rendered . . . ."); TEX. R. CIV. P. 203.2 (requiring deposition officer to file sworn certificate stating "the amount of the deposition officer's charges for preparing the *original* deposition transcript, which the clerk of the court must tax as costs" (emphasis added)); *see, e.g.*, *Shaikh v. Aerovias de Mexico*, 127 S.W.3d 76, 82 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("If any of the deposition costs listed in Aeromexico's Bill of Costs were the court reporter's charges for preparing the *original* deposition transcript, a certificate as required by rule 203.2(f) should have been filed with the Harris County District Clerk." (emphasis added)). Because the record does not reflect that the district clerk was asked to tax the costs, we conclude that the Company has not waived this issue by not filing a motion to re-tax the costs to complain about the court clerk's taxation of any specific cost. *See Waste Mgmt. of Texas, Inc.*, 2014 WL 6705741, at *4 ("As

41

far as we can tell from the record, Texas Disposal has not presented to the district clerk either of the appendices of costs that it has presented to this Court. Likewise, the record indicates that the only bill of costs issued by the district clerk in this matter is for $158, which reflects various filing fees and a clerk's record. This is, then, . . . the current, official amount of Texas Disposal's court costs."); *Shaikh*, 127 S.W.3d at 82 (noting that costs are those items included in clerk's bill of costs).

The record shows that LP filed a motion for entry of judgment, in which it sought a total of $3,707.85 in costs, comprised of filing fees of $276.00 and court reporter fees in the amount of $3,431.85 for "depositions in this matter that were used at trial." To its motion, LP appended the affidavit of its attorney, who testified that the attached costs were necessarily incurred in the litigation; receipts from the district clerk for various filings; and invoices from the court reporter "For the Original & 1 Copy of the Deposition of: Richard Furlin," in the amount of $1,515.30; "For the Original & 1 Copy of the Deposition of: Vijay Goradia," in the amount of $1,444.30; and "For the Original & 1 Copy of the Deposition of: David Wascom," in the amount of $772.25. The district clerk's bill of costs in the record before us includes only fees for the clerk's record. The trial court, in its judgment, awarded LP "Court costs in the amount of $3,707.85."

We hold that the trial court erred by taxing the Company with a specific amount of costs, i.e., "Court costs in the amount of $3,707.85," in the judgment. *See*

*Diggs*, 482 S.W.3d at 674 ("The judgment should not state the amount taxed as costs, but only that costs are awarded against a certain party.").

Moreover, to the extent that the trial court's award includes fees for copies of deposition transcripts, we note that section 31.007(b) expressly limits recovery of costs to the fees of the court reporter for the *original* of stenographic transcripts necessarily obtained for use in the suit. *See* TEX. CIV. PRAC. & REM. CODE § 31.007 (providing that trial court "may include in any order or judgment all costs," including "fees of the court reporter for the *original* of stenographic transcripts necessarily obtained for use in the suit" (emphasis added)); TEX. R. CIV. P. 140 (disallowing fees for copies); *Waste Mgmt. of Texas, Inc.*, 2014 WL 6705741, at *4 ("The costs for video depositions or copies of depositions or transcripts, however, are not recoverable as court costs."); *Gumpert*, 312 S.W.3d at 241–42 (holding that "because no statute or rule authorizes the recovery of the costs to videotape a deposition or obtain a copy of a deposition transcript," those items are not recoverable costs); *Shaikh*, 127 S.W.3d at 82 (holding costs of copying depositions are not taxable costs).

Accordingly, we sustain the Company's fourth issue.

## Conclusion

We reverse the portion of the trial court's judgment awarding LP prejudgment interest and remand to the trial court for a re-computation of prejudgment interest in

accordance with this opinion. We modify the trial court's judgment to delete the trial court's award of a specific amount of costs. As modified, we affirm the remainder of the trial court's judgment.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.