**Opinion issued May 30, 2024**



In The

# Court of Appeals

### For The

## First District of Texas

————————————————

### NO. 01-23-00351-CV

————————————————

### DAVID KISH, Appellant

### V.

### MASTIFF MIX, Appellee

---

### On Appeal from County Civil Court at Law No. 3
### Harris County, Texas
### Trial Court Case No. 1198660

---

### MEMORANDUM OPINION

Appellant David Kish appeals from the county court's order finding that Sandra and Israel Garza's dog is not a "dangerous dog" as defined by Texas Health and Safety Code Section 822.041. In two issues, David contends that (1) the evidence is legally and factually insufficient to support the trial court's judgment

because the evidence upon which the trial court relied was untimely, constituted unfair surprise, and was not authenticated; and (2) the trial court abused its discretion in its admission and exclusion of certain evidence and these errors were harmful. We reverse and remand.

## Background

David and Julie Kish and Israel and Sandra Garza are next door neighbors. On December 20, 2022, David filed a "Report of Unprovoked Attack or Acts by a Dog to be Declared Dangerous" in Justice Court, Precinct 4, Place 1, requesting that the Garzas' dog, a Mastiff mix named Anakin, be declared a "dangerous dog" as defined by Texas Health and Safety Code Section 822.041.[1] David alleged that he and Julie, along with their Maltipoo, Daisy, were returning from their mailbox across the street when Anakin left his enclosure through an open gate, chased Daisy across the street, and attacked her in the Kishes' backyard. David alleged that he and Julie reasonably believed that Anakin was going to attack them as well, and that he was being treated for post-traumatic stress disorder (PTSD) stemming from the incident. He further alleged that Daisy later died as a result of the attack.

On January 11, 2023, following a hearing, the justice court entered an order finding that the Garzas' dog was a "dangerous dog" under Health and Safety Code Section 822.041 and ordering the Garzas to comply with the requirements of Health

---

[1] *See* TEX. HEALTH & SAFETY CODE § 822.041(2) (defining "dangerous dog").

and Safety Code Chapter 822, Subchapter D, and Section 8 of the Harris County Animal Regulations, not later than thirty days from the date of the order.[2] The Garzas complied with the requirements and Anakin was released to them.

Sandra appealed the dangerous dog order to county court. The court entered an order setting trial via videoconference on February 8, 2023, and ordering that all trial exhibits be filed into the case five days before the trial setting. At trial, David, Julie, Israel, and Sandra testified in narrative form.

### 1.   David

On December 10, 2022, David and Julie were walking to their mailbox with their Maltipoo, Dixie, who was off leash at the time. David testified that their patio home is next door to the Garzas' home, and on the other side of the Garzas' home is a third home which sits at the corner. The mailboxes are located across the street from the third home. David testified that as they were walking back toward their home he heard some commotion and "then what I believe happened is that the—as the mastiff mix came out, I believe Dixie actually maybe ran towards it to try to protect us." When the trial court asked David what he saw, he replied, "I saw Dixie

---

[2]   The Garzas were required to (1) register the dog with the Veterinary Public Health Division, pay an annual license of $50, provide proof that the dog was or will be neutered, and implant the dog with a microchip; (2) restrain the dog at all times on a leash or in a secure enclosure; and (3) obtain liability insurance or show proof of financial responsibility in an amount of at least $100,000 to cover damages resulting from any future attack by their dog.

running from the mastiff towards our house." David testified that he then saw Anakin chase Dixie across the Garzas' front lawn to the Kishes' home where Dixie ran into the opening next to their butterfly garden. He testified that he heard growling and barking and Dixie yelping and crying. David testified that he and Julie rushed to try and save Dixie, and that he expected Anakin to attack them as well. David testified that the Garzas tried calling Anakin, but the dog did not listen. As David and Julie reached their backyard, Anakin ran out of the opening and past David, heading toward the Garzas' home. David testified that he had feared the dog would run toward him at that moment. When David and Julie returned to their butterfly garden, they found Daisy hiding in the flowerbeds.

David testified that Daisy was injured and taken to an animal hospital where she had emergency surgery. Daisy died as a result of her injuries one week later. David testified that he was treated for PTSD and had trouble sleeping after the incident.

### 2.     Julie

Julie testified that the incident occurred as she and David were returning from their mailbox with Daisy. Daisy was running ahead of them when she and David saw the Garzas' dog coming out of their gate. Julie testified that they rushed to their butterfly garden where they heard Daisy crying and yelping and heard Anakin

4

growling. Julie stated that Anakin was coming out of the area when they reached the garden. Julie took Daisy to the vet after the incident.

Julie testified that Israel texted her over the next few days to check on Daisy's condition, and that he took responsibility for the incident and provided his credit card information to her to pay for the vet bills. Julie testified that she did not want the animal hospital to have to call the Garzas each time a procedure was necessary, so she paid the bills as they came due. She testified that she and David met with the Garzas after Daisy died, but the Garzas were no longer concerned and blamed Daisy for the incident.

Julie testified that she was terrified of the Garzas' dog because the Garzas told her that Anakin had attacked another dog in 2021. Julie stated that Sandra told her the only reason Anakin had attacked the dog was because Mr. Tashman, who was walking the dog, was yelling at Sandra at the time. Julie stated that Sandra also told her that Anakin had previously bitten Israel's brother. Julie testified that another neighbor, Barbara Joritz, told her that Anakin had run toward her while she was walking another neighbor's dog, and that she had been afraid the dog would attack her. The trial court admitted the reports filed by the neighbors regarding the incidents involving Anakin and a November 16, 2021 letter from the homeowner's association to the Garzas requesting that the Garzas keep their dog secured following the 2021 incident.

Prior to the Garzas' testimony, the trial court asked whether the Garzas had videos of the incident. Israel responded that they had videos from footage from their outdoor cameras on the day of the incident. He stated that the justice court had not allowed him to introduce the videos into evidence at the first trial.

### 3. Israel

Israel testified that he and Sandra were returning home with their grandchildren on the day of the incident. One of their grandsons reported that the side gate was open, and Israel and Sandra ran out behind Anakin who had already exited the gate.[3] Israel testified that the Kishes were at their mailbox across the street about twenty yards away at the time. Israel testified that he heard Dixie yelping, but that Anakin was not growling. When Israel called for Anakin, Anakin came out of the Kishes' backyard and passed by Israel and David on his way back home. Israel testified that Julie arrived at her house after Anakin was back inside the Garzas' gate.

Israel testified that Anakin did not launch or bark at the Kishes, and that Julie was still approximately twenty yards away when the incident occurred. Israel testified that as Julie approached, she said "oh, it's okay" or "it's all right" and "[Dixie]'s probably just scared," and that they laughed about it. He testified that he

---

[3] Israel testified that despite the Kishes' repeated references to Anakin as a "Mastiff mix," the dog is registered as a Labrador/Setter mix with Harris County. Israel acknowledged that Anakin has never been DNA-tested.

and Sandra have eleven grandchildren and that they would never allow a dangerous dog in their presence.

Israel testified that, after he returned home, Sandra went outside to talk to the Kishes. Israel stated that David initially had difficulty lifting the metal shelf of the butterfly enclosure so that Julie could get Dixie out, but they eventually managed to get her out. One hour later, David went to the Garzas' home to ask for antiseptic wipes because Dixie had two puncture wounds. While Sandra went to get the wipes, Israel invited David in the house. Israel testified that David showed no apprehension while they were talking and never asked whether Anakin was secure before entering the home.

Israel testified that he texted the Kishes after the incident because he was a good neighbor and concerned about Dixie. He stated that Anakin is an indoor dog and that he only goes outside to do his business and play with his toys. He testified that he always walks Anakin on a leash, but the Kishes never have Dixie on a leash. Israel stated that Anakin has never bitten anyone. Israel testified that after Mr. Tashman posted a statement on the neighborhood social networking site, Nextdoor, following his encounter with Anakin in 2021, Julie came to the Garzas' defense responding that the Garzas were responsible dog owners, and that Anakin was a sweet dog.

At the conclusion of Israel's testimony, the following exchange took place:

THE COURT: Are you offering [the videos] as an exhibit?

MR. GARZA: Yes. So they are videos, Your Honor.

THE COURT: Do you have any objection?

MR. KISH: I object. First off, all exhibits had to be filed five days before the hearing. I have never seen these exhibits. I don't know if they are authentic. If videos are shown in court, Julie and I are not going to be on to watch them. We don't want to relive the events of that day. So I don't know whether they are authentic. Sounds like they were Photoshopped in pieces of videos and they weren't filed in a timely manner. So I am objecting to the showing of the videos. I am not objecting to the defendants testifying as to what they saw, but I am objecting to the videos.

THE COURT: Overruled. I'll allow the videos. You go ahead and start getting those together. I want to hear from Mrs. Garza.

### 4. Sandra

Sandra testified that when they arrived home on the day of the incident, she saw Dixie running across the street toward their neighbor's yard. The Garzas' other dog, a Chihuahua, was frightened by Dixie and began barking but later ran inside. Sandra testified that Anakin then began chasing Dixie. She testified that the Kishes had been walking away from their mailbox at the time and were in front of the Garzas' driveway, unaware of what was happening. After Sandra put their Chihuahua back in the house, she came outside to see if Dixie was okay. Sandra testified that when Julie removed Dixie from underneath the enclosure, she saw that a portion of Dixie's skin was "pushed back" as if she had been scraped, and that it was the only abrasion she saw on Dixie.

8

The trial court then watched the series of five-minute video clips offered by the Garzas and admitted them into evidence as Exhibit 9.[4] Israel narrated the videos and the trial court asked numerous questions as they played. Afterwards, the trial court asked the Kishes several questions about the galvanized metal planter where Dixie had wedged herself. The trial court allowed the Garzas to introduce a photo of the Kishes' planter. In response to the Garzas' suggestion that Dixie's injuries were caused by the planter, Julie stated that Dixie's veterinarian confirmed that all of Dixie's injuries stemmed from the dog bite wounds she sustained from Anakin. The Kishes did not introduce a copy of the veterinarian's written report at trial. Julie testified that Mr. Tashman did not press charges against the Garzas after the 2021 attack because the Garzas assured him that Anakin would never get out of his enclosure again.

At the conclusion of the hearing, the trial court stated:

This looks more like dogs getting into it than it does a dangerous dog. It didn't last for very long. I did not see any aggression of the dog to any human. Luckily I had a video. I can understand that maybe you felt that way since you—and it's just as likely that the dog was injured by the planter. I don't have any evidence either way. . . .

I don't find that there's—at this time I am not going to find that this is a dangerous dog.

---

[4] The Garzas did not tender the videos to the court reporter, and they are not part of the appellate record.

That same day, the trial court entered an order finding that the Garzas' dog was not a "dangerous dog" as defined by Health and Safety Code Section 822.041(2).

Following entry of the order, David (1) requested findings of fact and conclusions of law; (2) moved to admit new evidence, namely, their veterinarian's written report; and (3) filed a motion for new trial complaining of the improper admission of evidence, including the videos offered by the Garzas. David later filed a notice of past-due findings of fact and conclusions of law. Following a hearing, the trial court denied David's motion to admit new evidence. The trial court did not file findings of fact and conclusions of law, and David's motion for new trial was overruled by operation of law. This appeal followed.

## Discussion

David raises two issues on appeal. First, he contends that there is legally and factually insufficient evidence to support the trial court's judgment because the only evidence the trial court relied on was untimely, constituted unfair surprise, and was not authenticated. Second, he argues that the trial erred in admitting and excluding certain evidence and that these errors were harmful. We address David's second issue first.

### A.     Standard of Review and Applicable Law

Section 822.041(2) of Texas Health and Safety Code defines a "dangerous dog" as "a dog that:

(A)  makes an unprovoked attack on a person that causes bodily injury and occurs in a place other than an enclosure in which the dog was being kept and that was reasonably certain to prevent the dog from leaving the enclosure on its own; or

(B)  commits unprovoked acts in a place other than an enclosure in which the dog was being kept and that was reasonably certain to prevent the dog from leaving the enclosure on its own and those acts cause a person to reasonably believe that the dog will attack and cause bodily injury to that person.

TEX. HEALTH & SAFETY CODE § 822.041(2). Section 822.0421 permits an owner, whose dog has been determined to be a dangerous dog by a justice or municipal court, to appeal the decision to a county court or a county court at law. *See id.* § 822.0421(d). An appeal from a justice court judgment is tried de novo in the county court. *See* TEX. R. CIV. P. 506.3 ("A trial de novo is a new trial in which the entire case is presented as if there had been no previous trial."); *Abbott v. Hearthwood I Ass'n Inc.*, No, 14-18-00333-CV, 2020 WL 1026443, at *2 (Tex. App.—Houston [14th Dist.] Mar. 3, 2020, no pet.) (mem. op.).

## B.  Challenges to Evidentiary Rulings

David contends that the trial court abused its discretion by (1) admitting the Garzas' videos; (2) excluding the Garzas' text messages showing they had accepted responsibility for their dog escaping its enclosure and attacking Daisy; and (3) denying David's post-trial motion to admit the veterinarian's written report into evidence.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 235 (Tex. 2011) (citing *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005)); *Arispe v. Velazquez*, No. 01-23-00188-CV, 2023 WL 8938410, at *4 (Tex. App.—Houston [1st Dist.] Dec. 28, 2023, no pet.) (mem. op.). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules and principles. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). A trial court's judgment should not be reversed because of an erroneous evidentiary ruling unless the ruling probably caused the rendition of an improper judgment. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). A successful challenge to an evidentiary ruling usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *City of Brownsville*, 897 S.W.2d at 753–54.

### 1.    Admission of Videos

David argues that the trial court erred in admitting the Garzas' videos because they were untimely, constituted unfair surprise, and were not authenticated, and the error was not harmless.

At the conclusion of Israel's testimony, the trial court asked whether he was offering the videos as an exhibit, and Israel responded that he was. David objected to their admission on the grounds that the Garzas had failed to comply with the trial

court's January 30, 2023 order requiring that all trial exhibits be filed into the case five days before the trial setting, and the videos had not been authenticated. The trial court overruled David's objections and admitted the videos.

It is undisputed that the Garzas did not comply with the trial court's order, and Israel acknowledged as much at trial, stating "we just didn't present them or file them. We were trying to get the continuance." In their brief on appeal, the Garzas respond that the videos were admitted for the purpose of impeaching the Kishes' testimony that Anakin behaved in a way that placed the Kishes in reasonable fear that he would attack them. They argue that the recordings constitute prior inconsistent statements by the Kishes, and that the trial court properly admitted them as impeachment evidence under Rule of Evidence 613.[5] The Garzas, however, did not argue in the court below that the videos were admissible as impeachment evidence. Nor did the trial court give any indication that it was admitting the videos as impeachment evidence; rather, following David's objections, and without asking for a response from the Garzas, the trial court overruled the objections and admitted

---

[5] Texas Rule of Evidence 613 requires that prior to impeaching a witness about the witness's prior inconsistent statement (whether oral or written), a party must lay the proper predicate by first telling the witness the contents of the statement, the time and place of the statement, and the person to whom the witness made the statement. *See* TEX. R. EVID. 613(a)(1). A witness must also be given the opportunity to explain or deny the prior inconsistent statement. *See* TEX. R. EVID. 613(3). Even if the Garzas had preserved this argument for our review, they did not lay a proper foundation as required by Rule 613.

the evidence as part of the Garzas' case-in-chief. To preserve error for appellate review, a party's argument on appeal must comport with its argument in the trial court. *Greenville v. Bills*, No. 01-19-00264-CV, 2020 WL 1942457, at *8 (Tex. App.—Houston [1st Dist.] Apr. 23, 2020, no pet.) (mem. op.); *Pajooh v. Miller*, No. 01-16-00927-CV, 2018 WL 3233466, at *5 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op.). Because the Garzas' argument on appeal was not raised in the court below, we cannot consider it on appeal. *See Nat'l OilWell Varco, LP v. Sanchez*, No. 08-23-00096-CV, 2024 WL 519201, at *5 (Tex. App.—El Paso Feb. 9, 2024, no pet.) (concluding appellant waived argument that it was under no duty to disclose video on grounds that video was not responsive to any discovery request because defendant never raised argument in court below and trial court never considered issue).

As to David's authentication objection, an exhibit is admissible only if it is properly authenticated. *See* TEX. R. EVID. 901; *Elness Swenson Graham Architects, Inc. v. RLJ II–C Austin Air Lessee, LP*, 520 S.W.3d 145, 158 (Tex. App.—Austin 2017, pet. denied). Authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. TEX. R. EVID. 901(a). One such type of evidence is testimony that an item is what it is claimed to be. *See* TEX R. EVID. 901(b)(1). Here, Israel testified that he took four five-minute video clips from the footage recorded

14

by his outdoor cameras on the day of the incident, stating that "[w]e have cameras all around the house and we see everything unfold as it unfolds." Israel further stated, "I took all of them at five-minute clips and I started them all at 12:57 so it would all correspond." Videos can be authenticated by anyone with knowledge of the information recorded. *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 547 n.26 (Tex. 2018) (concluding video showing employee engaging in physical activities was sufficiently authenticated in personal injury suit arising from workplace accident where employee admitted in pretrial proceedings, at trial, and at all appellate levels that he was the person on the video and performed the activities depicted). The videotapes were sufficiently authenticated by Israel's testimony, and the trial court did not err in overruling David's objection.[6]

---

[6] Citing Texas Rule of Civil Procedure 193.6, David also argues that the trial court erred in admitting the videos because their admission constituted unfair surprise. Rule 193.6(a) states that "a party who fails to make, amend, or supplement a discovery response, including a required disclosure, in a timely manner may not introduce in evidence the material or information that was not timely disclosed . . . unless the court finds that: (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties. TEX. R. CIV. P. 193.6(a). The record does not reflect that David served discovery requests on the Garzas and, therefore, his reliance on Rule 193.6 is unavailing.

## 2.    Harm Analysis

Having concluded that the trial court abused its discretion in admitting the videos because the Garzas failed to comply with the trial court's order, we must determine whether their admission was harmful.

A party complaining of error in the admission of evidence must also show that the trial court's error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *U-Haul Int'l., Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012); *Fairmont Supply Co. v. Hooks Indus., Inc.*, 177 S.W.3d 529, 532 (Tex. App.–Houston [1st Dist.] 2005, pet. denied). This standard is less a precise measurement and more a matter of judgment. *Diamond Offshore*, 542 S.W.3d at 551. In making that judgment, we may consider whether there was contrary evidence that the improperly admitted evidence was calculated to overcome. *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). "We review the entire record [] and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted." *Id.*

The main issue at trial was whether the Garzas' dog was a dangerous dog as defined by Health and Safety Code Section 822.041(2)—in particular, whether Anakin committed acts which "cause a person to reasonably believe that the dog will attack and cause bodily injury to that person." *Id.* It is clear from the record that the Garzas believed that the videos were important to overcome the Kishes' testimony

16

that Anakin behaved in a way that made them believe he was going to attack them. At the hearing, Israel told the trial court that "[t]he videos will completely contradict a lot of what they're saying." *See Nissan Motor Co.*, 145 S.W.3d at 144 (noting that, in performing harm analysis, courts may consider whether there was contrary evidence that improperly admitted evidence was calculated to overcome).

David argues that the trial court did not merely consider the videos in determining that the Garzas' dog was dangerous but its judgment, in fact, turned on them. We agree. During his testimony, Israel repeatedly referred to the videos, telling the court that the videos would support his testimony. Once the videos were admitted into evidence, Israel began narrating the videos while the trial court asked him questions and for clarification while watching the videos. At the conclusion of the hearing, the trial court stated:

> This looks more like dogs getting into it than it does a dangerous dog. It didn't last for very long. I did not see any aggression of the dog to any human. Luckily I had a video. I can understand that maybe you felt that way since you—and it's just as likely that the dog was injured by the planter. I don't have any evidence either way. . . . I don't find that there's—at this time I am not going to find that this is a dangerous dog.[7]

---

[7]     We note that the justice court, which Israel testified did not allow him to introduce the videos at trial, determined that the Garzas' dog *was* a dangerous dog as defined under Section 822.041(2). *See* TEX. HEALTH & SAFETY CODE § 822.041(2).

Based on a review of the entire record, we conclude that the erroneously admitted videos probably caused the rendition of an improper judgment. Tᴇx. R. Aᴘᴘ. P. 61.1(a); *Nissan Motor Co.*, 145 S.W.3d at 144.[8]

We sustain David's second issue.[9]

## Conclusion

We reverse the trial court's judgment and remand the case for a new trial.

Amparo Monique Guerra
Justice

Panel consists of Chief Justice Adams and Justices Guerra and Farris.

---

[8] In light of our conclusion that the erroneous admission of the videos was harmful, we do not reach David's additional arguments that the trial court abused its discretion in excluding the Garzas' text messages and in denying David's motion to admit new evidence post-trial.

[9] Having sustained David's second issue, we do not address his first issue challenging the sufficiency of the evidence to support the trial court's judgment.